**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Edward CHIN, Defendant–Appellant.**

**No. 899, Docket 90–1503.**

United States Court of Appeals, Second Circuit.

Argued Feb. 26, 1991.

Decided May 2, 1991.

---

Louis M. Freeman, New York City (Freeman, Nooter & Ginsberg, of counsel), for defendant-appellant.

Martin E. Coffey, Asst. U.S. Atty., Brooklyn, N.Y. (Andrew J. Maloney, U.S. Atty., E.D.N.Y., of counsel), for plaintiff-appellee.

Before OAKES, Chief Judge, LUMBARD and CARDAMONE, Circuit Judges.

OAKES, Chief Judge:

Edward Chin appeals from a judgment of the United States District Court for the Eastern District of New York, Reena Raggi, *Judge*, convicting him of one count of transportation of child pornography in foreign commerce and one count of transportation of child pornography in interstate commerce, in violation of 18 U.S.C. § 2252(a)(1) (1988). On this appeal, he argues that the postal authorities' investigative technique violated due process, and that the district court's admission of certain evidence was harmful error. For the reasons set forth below, we affirm.

## FACTS

In early 1986, the United States Postal Inspection Service commenced an undercover investigation of the child pornography industry. As part of that investigation, postal inspectors established fictitious companies and pen pal clubs to identify persons interested in receiving child pornography. One of those companies was Far Eastern Trading ("Far Eastern"), which purported to be a distributor of child pornography.

Later that year, Chin received a mailing from Far Eastern, promising a safe and legal way for United States citizens to receive child pornography in the mail. The Government never explained why Chin was sent this mailing; Chin suggested that he was targeted because he had previously responded to other advertisements from companies that distributed adult pornographic literature. Eventually, Chin ordered two magazines from Far Eastern's catalogue. Those magazines, however, were never delivered.

Thereafter, undercover Postal Inspector John McDermott, having obtained Chin's name and address from a list of Far Eastern customers, arranged for his fellow inspectors to send Chin a solicitation letter and questionnaire under the name of another fictitious entity, the Candy Love Club ("CLC"). That mailing asked Chin to identify his sexual practices and interests, including whether he was interested in receiving materials dealing with child pornography. Chin completed the questionnaire, listing "Pre–Teen sex—Heterosexual" as his top preference, and mailed it to the address used by the undercover inspectors.

By submitting the questionnaire, Chin became a member of CLC, and began to receive regular copies of its newsletter. This newsletter—which in reality was a publication created and published by postal inspectors—contained advertisements from individuals interested in a variety of sexually-oriented materials, including child pornography.[1] Chin responded to several advertisements in the CLC newsletter and indicated that he was interested in trading "kinky" photographs of women, magazines containing such photographs, and photographs and magazines depicting teenagers and pre-teens.

On May 19, 1988, McDermott, posing as "Ted from Medford," wrote to Chin and told him that he had many "hot photos of girl subjects both white and oriental, pre-teen and teen." Chin testified that, at the time he received this letter, he was lonely and beset with a variety of personal problems, including the illness of his father and a recent divorce. In order to impress McDermott and win his friendship, Chin testified, he responded to the letter with a fictitious list of pornographic materials that he claimed to possess.

After exchanging several letters describing their respective collections, McDermott suggested that they loan each other magazines to copy. Chin, however, had serious reservations about going through with this arrangement. In a letter to McDermott, Chin stated that he had heard about a government sting operation involving Far Eastern and about the Postal Service's efforts to prevent individuals from sending child pornography through the mails. "Believe me," he wrote, "I am *dying* to see the magazine you mentioned, but I'm not sure that I'm ready to risk destroying my life at this point."

Feigning sympathy with Chin's concerns, McDermott sent letters inquiring about Chin's health and spirits and extending holiday greetings. On January 23, 1989, Chin wrote McDermott thanking him for his expressions of personal concern. He also confided that he would be travelling to Amsterdam, and invited McDermott to "let [him] know if [McDermott] might want anything or if [McDermott had] any contacts there that might be helpful in searching out Lolita material or even meeting them." On two occasions, McDermott wrote back to Chin encouraging him to

---

1. According to the Government, the advertisements themselves were not written by postal inspectors, but rather by actual CLC subscribers. However, only postal inspectors in an undercover role would receive and answer responses to the advertisements.

proceed with the trip. Specifically, he stated:

> Let me know if you're going to [Europe or Asia] and I'll send you some money for some Lolita material for me, if you don't mind.
>
> Definitely bring something back for me. Either the most recent Lolita magazine available or any 8 mm film you'd think I'd [sic] might like. I will gladly reimburse you when you return.

Chin proceeded with his trip and purchased several magazines.

In a March 29, 1989 letter to Chin, McDermott enclosed photocopies of two magazine covers that he planned to send Chin. A few weeks later, Chin sent McDermott a copy of one of the magazines he had purchased in Amsterdam, entitled "Schoolgirls." On August 28, 1989, in response to this mailing, McDermott and several other inspectors arrested Chin at his home. After being confronted with the copy of "Schoolgirls," Chin consented to a search of the briefcase where he kept the remainder of his pornographic materials. The search turned up two magazines, entitled "Lolita, Number 50" and "Nymphettes," an envelope from Far Eastern, a coding card from CLC used to decipher the advertisements in the club's newsletter, letters from McDermott, and the photocopies that had accompanied McDermott's March 29 letter.

At a pretrial hearing, Chin moved to dismiss the indictment on the ground that the Government had failed to demonstrate that it had either probable cause or reasonable suspicion to target him for an undercover operation. The court denied the motion, and the case proceeded to trial. At trial, Chin raised the defense of entrapment.

Part of the Government's evidence consisted of a Notice and Assent to Forfeiture (the "Notice") relating to the forfeiture of a magazine entitled "Seventeen's Teenager," which was addressed to Chin and which had been seized by the United States Customs Service in 1986 prior to delivery. Although Chin acknowledged that he had ordered the magazine, he argued that he was unaware that the magazine contained child pornography. Relying on a statement in the Notice providing that assent to forfeiture was "neither an acknowledgment that the materials being forfeited were solicited nor an admission that [the addressee] knew they were obscene," Chin moved to prohibit introduction of the Notice. His motion was denied, on the ground that, "by signing [the Notice], where it says signature of importer, it can fairly be seen as an admission that [Chin] was the importer of this document." In its summation, the Government relied on the Notice as evidence of Chin's predisposition, and the court instructed the jury that it could consider the Notice in deciding whether Chin was "predispos[ed] or willing[ ] to engage in the criminal charges in the indictment."

The jury returned a verdict of guilty, and Chin was sentenced to concurrent terms of 52 weekends of imprisonment, three years' supervised release conditioned on obtaining psychiatric treatment, a $15,000 fine, and a $100 special assessment. He was also directed to pay the costs of his imprisonment and supervised release. This appeal followed.

## DISCUSSION

Chin raises three claims on appeal. First, he argues that the postal authorities violated his right to privacy by targeting him for an undercover investigation without an individualized basis for suspecting him of wrongdoing. Second, he claims that the conduct of the postal authorities during the course of the investigation violated the Due Process Clause. Finally, he claims that the court's decision to admit the Notice as evidence of his predisposition constituted harmful error. For the reasons set forth below, we reject all of these claims.

### 1. Requirement of Individualized Suspicion

Chin's first contention is that his right to privacy was violated when the postal authorities targeted him for an undercover operation without any basis for suspecting that he was engaged in or was likely to engage in a crime. According to Chin, the suspicionless instigation of an investigation

against him violated his "right to be let alone," a right Justice Brandeis characterized as "the most comprehensive of rights and the right most valued by civilized men." *Olmstead v. United States*, 277 U.S. 438, 478, 48 S.Ct. 564, 572, 72 L.Ed. 944 (1928) (Brandeis, J., dissenting). We do not agree.

■ Initially, it is undisputed that McDermott's conduct did not infringe on Chin's privacy interests as protected by the Fourth Amendment. Recognizing the inapplicability of the Fourth Amendment to his claim, Chin relies instead on the privacy guarantees incorporated in the Fourteenth Amendment's Due Process Clause. The requirement that police activity be based on individualized suspicion, however, is directly rooted in the Fourth Amendment's prohibition on unreasonable searches and seizures, *see, e.g., Terry v. Ohio*, 392 U.S. 1, 9, 88 S.Ct. 1868, 1875, 20 L.Ed.2d 889 (1968) (relying on the Fourth Amendment right to "personal security"), and the Supreme Court has routinely upheld suspicionless police activity where no Fourth Amendment interests are implicated, *see, e.g., Michigan v. Chesternut*, 486 U.S. 567, 576, 108 S.Ct. 1975, 1981, 100 L.Ed.2d 565 (1988) (upholding suspicionless pursuit of individual where pursuit did not constitute a seizure under the Fourth Amendment). As such, there is no basis for imposing a requirement of individualized suspicion on law enforcement officials for undercover investigations implicating no Fourth Amendment concerns. *Accord United States v. Luttrell*, 923 F.2d 764, 764 (9th Cir.1991) (en banc); *United States v. Jacobson*, 916 F.2d 467, 469 (8th Cir.1990) (en banc), *cert. granted,* —— U.S. ——, 111 S.Ct. 1618, 113 L.Ed.2d 716 (1991); *United States v. Gamble*, 737 F.2d 853, 860 (10th Cir.1984); *United States v. Thoma*, 726 F.2d 1191, 1198 (7th Cir.), *cert. denied*, 467 U.S. 1228, 104 S.Ct. 2683, 81 L.Ed.2d 878 (1984); *see also United States v. Jenrette*, 744 F.2d 817, 824 n. 13 (D.C.Cir.1984) (rejecting reasonable suspicion requirement in context of undercover investigations of public officials), *cert. denied*, 471 U.S. 1099, 105 S.Ct. 2321, 85 L.Ed.2d 840 (1985); *United States v. Myers*, 635 F.2d 932, 941

(2d Cir.) (same), *cert. denied*, 449 U.S. 956, 101 S.Ct. 364, 66 L.Ed.2d 221 (1980).

■ In any event, even assuming that the Due Process Clause requires some level of individualized suspicion before government agents may target an individual for an intrusive undercover investigation, that requirement would not require reversal of Chin's conviction on the facts presented here. First, no constitutionally cognizable invasion of Chin's privacy resulted from the initial mailing to Chin of Far Eastern's catalogue, notwithstanding the fact that this mailing was unsolicited. *See Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60, 72, 103 S.Ct. 2875, 2883, 77 L.Ed.2d 469 (1983) (recognizing a right to send unsolicited mailings, and noting that the " 'short, though regular, journey from mail box to trash can … is an acceptable burden [on the recipient], at least so far as the Constitution is concerned' ") (quoting *Lamont v. Comm'r of Motor Vehicles*, 269 F.Supp. 880, 883 (S.D.N.Y.), *aff'd*, 386 F.2d 449 (2d Cir.1967), *cert. denied*, 391 U.S. 915, 88 S.Ct. 1811, 20 L.Ed.2d 654 (1968)). The fact that the postal authorities mailed Chin the Far Eastern catalogue in an effort to discover whether he was likely to violate the law is immaterial; invasion of privacy turns on the intrusion to the individual, not on the subjective motivation of the governmental actor. *Cf. Lewis v. United States*, 385 U.S. 206, 210–11, 87 S.Ct. 424, 427, 17 L.Ed.2d 312 (1966) (concluding that consensual entry into defendant's home did not violate any legitimate expectation of privacy even though persons entering home were in reality government agents hoping to incriminate defendant); *see also United States v. Lyons*, 706 F.2d 321, 329 (D.C.Cir. 1983) (following *Lewis*). As to the postal authorities' later communications with Chin—including the establishment of a fictitious pen pal relationship preying on Chin's loneliness and insecurity—those contacts all took place after Chin had ordered child pornography from Far Eastern's catalogue. As such, even if those contacts were so invasive as to implicate Chin's right to privacy under the Due Process Clause, they were supported by a reason-

able belief that Chin was likely to violate the law.

### 2. The Postal Authorities' Conduct

■ **a. The Rights of Chin**—At trial, Chin argued that the postal authorities entrapped him into violating the law. To prevail on this defense, he had to demonstrate that government agents induced him into committing a crime to which he was otherwise not predisposed. *See United States v. Myers*, 692 F.2d 823, 835 (2d Cir.1982). Chin failed to convince the jury on this issue, and he has not pursued it on appeal. Rather, his claim now is that the techniques the Government employed in its undercover investigation were so outrageous as to violate the Due Process Clause, regardless of whether he was predisposed to purchase and distribute child pornography.[2] Specifically, he argues that the postal authorities' use of "psychological manipulation" in the course of their investigation was "as evil as beatings and physical torture" and requires dismissal of the indictment.

At the outset, we note that, to the extent the claim is that McDermott's use of "psychological manipulation" violated Chin's due process rights because it caused him to commit crimes he otherwise would not have committed, his claim is precluded by the Supreme Court's holding in *United States v. Russell*, 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973). In that case, the Court reaffirmed the "subjective" definition of entrapment first laid out in *Sorrells v. United States*, 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413 (1932), which limits the defense to defendants who can demonstrate a lack of predisposition to commit the charged offense. *See* 411 U.S. at 433, 93 S.Ct. at 1643. In so doing, the Court explicitly rejected an objective definition of entrapment, which would focus not on the defendant's predisposition, but on whether the government "instigated the crime." According to the *Russell* Court, focusing on the nature of the governmental involvement, rather than on the defendant's predisposition, would impermissibly "give the federal judiciary a 'chancellor's foot' veto over law enforcement practices of which it did not approve." 411 U.S. at 435, 93 S.Ct. at 1644. Thus, were we to accept Chin's suggestion that governmental instigation of criminal activity violates the due process rights of even predisposed defendants, we would "'undermine the Court's consistent rejection of the objective test of entrapment by permitting it to reemerge cloaked as a due process defense.'" *United States v. Williams*, 705 F.2d 603, 619 (2d Cir.1983) (quoting *United States v. Jannotti*, 673 F.2d 578, 608 (3d Cir.) (en banc), *cert. denied*, 457 U.S. 1106, 102 S.Ct. 2906, 73 L.Ed.2d 1315 (1982)). *Accord United States v. Thoma*, 726 F.2d 1191, 1199 (7th Cir.) (holding that governmental inducement of criminal activity is unlawful only with respect to defendants who are not predisposed), *cert. denied*, 467 U.S. 1228, 104 S.Ct. 2683, 81 L.Ed.2d 878 (1984).

■ In light of *Russell*, then, whether investigative conduct violates a defendant's right to due process cannot depend on the degree to which the governmental action was responsible for inducing the defendant to break the law. Rather, the existence of a due process violation must turn on whether the governmental conduct, standing alone, is so offensive that it "shocks the conscience," *Rochin v. California*, 342 U.S. 165, 172, 72 S.Ct. 205, 209, 96 L.Ed. 183 (1952), regardless of the extent to which it led the defendant to commit his crime.[3] Extreme physical coercion, as the

---

**2.** Chin's formulation of his "outrageous conduct" claim derives from language in *United States v. Russell*, 411 U.S. 423, 431–32, 93 S.Ct. 1637, 1642–43, 36 L.Ed.2d 366 (1973) ("[W]e may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction...."), and *Hampton v. United States*, 425 U.S. 484, 495 n. 7, 96 S.Ct. 1646, 1653 n. 7, 48 L.Ed.2d 113

(1976) (Powell, J., concurring) (suggesting that due process might be violated where "[p]olice overinvolvement in crime ... reach[es] a demonstrable level of outrageousness").

**3.** The Tenth Circuit, we note, has stated an opposite view, even while finding no due process violation. *See United States v. Gamble*, 737 F.2d 853, 858 (10th Cir.1984) ("A defendant may not invoke the Due Process Clause ... unless the government's acts, no matter how outrageous,

Government concedes, would certainly fall within this category. *See, e.g., id.* (police officers broke into defendant's bedroom, attempted to pull drug capsules from his throat, and, finally, forcibly pumped his stomach to retrieve the capsules); *Huguez v. United States,* 406 F.2d 366, 381–82 (9th Cir.1968) (border patrol officers forcibly removed narcotics packets from defendant's rectum while defendant was handcuffed and held spreadeagled across the table by other officers).

■ The type of psychological manipulation at issue here—in particular, McDermott's efforts to win Chin's friendship and trust through the creation of a phony pen pal relationship—poses far less serious concerns. The use of physical coercion such as that involved in *Rochin* and *Huguez* is unconstitutional because it causes injuries that are "brutal and … offensive to human dignity." *Rochin,* 342 U.S. at 174, 72 S.Ct. at 210. By contrast, the "injury" inflicted by McDermott's actions was limited to the feelings of betrayal Chin experienced when he realized that his sense of security in conspiring to violate the law was unfounded. This sort of harm can hardly be said to "shock the conscience" as would physical coercion or torture.[4] *Accord United States v. Simpson,* 813 F.2d 1462, 1466 (9th Cir.1987) (rejecting outrageous conduct claim where government informant pretended to be defendant's close personal friend and had sex with defendant on regular basis, and concluding that the Due Process Clause "does not protect [the individual] from voluntarily re-

posing his trust in one who turns out to be unworthy of it"); *cf. United States v. White,* 401 U.S. 745, 749, 91 S.Ct. 1122, 1125, 28 L.Ed.2d 453 (1971) (plurality opinion) (finding that, "however strongly a defendant may trust an apparent colleague, his expectations in this respect are not protected by the Fourth Amendment when it turns out that the colleague is a government agent regularly communicating with the authorities").

■ *b. The Rights of Third Parties—* Our conclusion that McDermott's exploitation of Chin's trust did not violate Chin's due process rights does not end our analysis, however. One factor distinguishes this case from the usual undercover operation and, in our opinion, raises very serious concerns with respect to the rights of third parties—namely, the rights of the children Congress sought to protect in enacting the prohibitions on child pornography. Our concern is that, in contrast to the usual sting operation, in which the Government sets up a phony drug transaction or another sort of dummy crime, the government agent in this case encouraged Chin to go out and commit a *real* crime, with *real* victims, just so Chin could later be arrested and prosecuted. In particular, McDermott explicitly and repeatedly encouraged Chin to proceed with his trip to Amsterdam to obtain "Lolita materials," despite the fact that purchasing child pornography, by increasing the demand for such materials, serves to further the sexual exploitation of minors.[5] In this regard, McDermott's en-

---

had a role in inducing the defendant to become involved in the crime."). For the reasons set forth above, however, we believe that *Gamble's* formulation of the outrageous conduct claim cannot be reconciled with the Supreme Court's opinion in *Russell.*

4. In so holding, we do not mean to suggest that a finding of outrageousness depends on an artificial distinction between physical and psychological harms. There may, of course, be cases where psychological torture rises to the level of outrageousness that would constitute a violation of the Due Process Clause. *See Watts v. Indiana,* 338 U.S. 49, 53, 69 S.Ct. 1347, 1350, 93 L.Ed. 1801 (1949) (finding that "[w]hen a suspect speaks because he is overborne, it is immaterial whether he has been subjected to a physi-

cal or a mental ordeal"); *United States v. Kelly,* 707 F.2d 1460, 1477 (D.C.Cir.) (noting that "psychological coercion," as well as physical coercion, may constitute outrageous conduct under the Due Process Clause), *cert. denied,* 464 U.S. 908, 104 S.Ct. 264, 78 L.Ed.2d 247 (1983). Our holding today is simply that feelings of "betrayal" are not the sort of injuries that constitute a violation of a defendant's rights under the Due Process Clause.

5. The Supreme Court's analysis of child pornography in *New York v. Ferber,* 458 U.S. 747, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982), demonstrates the harm caused by the purchase of even one item of child pornography:

The distribution of photographs and films depicting sexual activity by juveniles is intrinsi-

couragements bring to mind the concerns expressed by Judge Henry Friendly in *United States v. Archer*, 486 F.2d 670 (2d Cir.1973):

> It would be unthinkable ... to permit government agents to instigate robberies and beatings merely to gather evidence to convict other members of a gang of hoodlums. Governmental 'investigation' involving participation in activities that result in injury to the rights of its citizens is a course that courts should be extremely reluctant to sanction.

*Id.* at 676–77; *see also United States v. Thoma*, 726 F.2d 1191, 1199 (7th Cir.) ("[W]e will closely examine those cases in which the Government misconduct injures third parties in some way."), *cert. denied*, 467 U.S. 1228, 104 S.Ct. 2683, 81 L.Ed.2d 878 (1984).[6]

Nonetheless, upon careful review of the record, we are unable to conclude that McDermott's statements were ultimately responsible for the harms inflicted by Chin's purchase and importation of child pornography. A necessary prerequisite for demonstrating that an undercover investigation violated the rights of third parties is proof that the governmental action actually caused the defendant to commit a crime that would otherwise not have been committed.[7] Here, Chin is unable to make such a showing. To be sure, it was the postal authorities who initiated the contacts with Chin through the Far Eastern and CLC mailings, and who suggested that Chin send child pornography through the mails. However, Chin readily responded to the Government's initial solicitations, and repeatedly expressed a strong interest in exchanging child pornography magazines. Moreover, although at one point Chin noted some reservations about proceeding with McDermott's plan, Chin was the first to suggest the trip to Amsterdam and was solely responsible for arranging, financing, and executing the journey. Under these circumstances, McDermott's statements cannot be said to have caused the injuries inflicted by Chin's crime.

Because Chin cannot establish that government agents were responsible for his purchase and importation of illicit magazines, we need not decide whether the harm his crime inflicted on third parties—specifically, the stimulation of demand for child pornography—is sufficient to constitute a due process violation under the principles set forth in *Archer, supra*. However, we take this opportunity to caution law enforcement agents to think twice before engaging in investigative techniques that encourage individuals to commit actions that harm innocent third parties. In the words of Judge Friendly, "[p]rosecutors and their agents naturally tend to assign great weight to the societal interest in apprehending and convicting criminals; the

---

cally related to the sexual abuse of children in at least two ways. First, the materials produced are a permanent record of the children's participation and the harm to the child is exacerbated by their circulation. Second, the distribution network for child pornography must be closed if the production of material which requires the sexual exploitation of children is to be effectively controlled. *Id.* at 759, 102 S.Ct. at 3355–56 (footnote omitted).

**6.** Chin frames his claim that the postal authorities violated the rights of third parties somewhat differently. His claim is that, by sending appellant photocopies of child pornography "as 'bait,'" McDermott "degrade[d] [the children] and perpetuate[d] the initial harm by making the demeaning photograph available to individuals who might otherwise never have obtained it." Brief for Appellant at 23. However, effective enforcement of child pornography laws "will generally require, as a practical necessity, the controlled delivery of items of contraband to individuals ... who are predisposed to commit this crime." *United States v. Duncan*, 896 F.2d 271, 276 (7th Cir.1990); *see also United States v. Esch*, 832 F.2d 531, 539 (10th Cir.), *cert. denied*, 485 U.S. 908, 108 S.Ct. 1084, 99 L.Ed.2d 242 (1987). Given the slight harm involved in McDermott's mailing of blurred photocopies of pictures that had already been seized, we are not prepared to overturn Chin's conviction on this basis.

**7.** Proof that the investigation caused the defendant's crime is necessary to establish that the Government—rather than the defendant—was primarily responsible for the criminal conduct that caused the third party harm. Thus, an inquiry into the Government's role in instigating the defendant's actions is relevant here even though, for the reasons outlined above, it is not relevant with respect to the due process rights of the defendant himself.

danger is that they will assign too little to the rights of citizens to be free from government-induced criminality." *Archer*, 486 F.2d at 677.

### 3. Admission of the Notice

Chin's final claim is that the district court should not have admitted the Notice as evidence of his predisposition. He argues that, because the Notice stated that assent to forfeiture was "neither an acknowledgment that the materials being forfeited were solicited nor an admission that [the addressee] knew they were obscene," it was fundamentally unfair for the court to permit the Government to use the Notice against him in a criminal prosecution. As support for this claim, he argues that "the Due Process Clause prohibits the government from assuring an individual that certain conduct will not be used against him and then using that very same conduct to impeach his trial testimony." Brief for Appellant at 37 (citing, *e.g.*, *Doyle v. Ohio*, 426 U.S. 610, 618, 96 S.Ct. 2240, 2245, 49 L.Ed.2d 91 (1976) (holding that a defendant's post-arrest silence may not be used against him at trial where the defendant had previously received assurances that his reticence would not be used to inculpate him)).

▪ We agree with Chin that the court's decision to admit the Notice was erroneous. In our view, it is inconceivable that, by signing a form that explicitly provided that signature would not constitute an admission of an intent to import obscene materials, Chin somehow "admitted" that he was the importer of child pornography. We also believe that the Government should not have referred to the Notice as evidence of Chin's predisposition, either in its cross-examination of Chin or in its summation.

▪ However, based on our review of the record, we conclude that the admission and use of the Notice was harmless error. The crucial fact, we believe, is that Chin himself admitted on direct examination that he ordered the magazine in question. Thus, by the time the Notice was admitted, there was no longer any dispute as to whether Chin had intended to import the magazine, and the Notice was therefore simply cumulative on that issue. Moreover, although Chin denied that he knew that the magazine contained child pornography, the Notice undermined this claim only insofar as it suggested to the jury that Chin had intentionally ordered the magazine, and that he therefore must have known of the magazine's contents. Given that Chin had already conceded that he voluntarily sent away for the magazine, then, the Notice added nothing new on this matter either.

Accordingly, the judgment of the district court is affirmed.