UNITED STATES of America

v.

Tyrone DAVIS, et al., Defendants.

No. 13CR986–LTS.

United States District Court,
S.D. New York.

Signed Nov. 5, 2014.

United States Attorney for the Southern District of New York by Edward B. Diskant, AUSA, New York, NY, for the United States of America.

Sullivan & Brill, LLP by Steven Brill, Esq., New York, NY, for Defendant Tyrone Davis.

Baldassare & Mara, LLC by Michael A. Baldassare, Esq., Newark, NJ, for Defendant Charles Bonner.

## OPINION AND ORDER

LAURA TAYLOR SWAIN, United States District Judge.

Defendants Tyrone Davis ("Davis"), Damon Chappelle ("Chappelle"), Jamil Speller ("Speller"), and Charles Bonner ("Bonner" and together, "Defendants") seek the dismissal of the above-captioned indictment against them on account of alleged "outrageous government conduct." Alternatively, Defendants move to compel the Government to produce impeachment material immediately and reveal the identity of a confidential informant and confidential witness earlier than they have otherwise undertaken to make such disclosure.

The Court has carefully reviewed the submissions of the parties and, for the following reasons, the motion is denied in its entirety.

## BACKGROUND

The Court accepts as true the facts proffered by the Defendants solely for the purposes of this motion practice. Unless otherwise noted, the facts recited herein are taken from the Defendants' motion papers.[1]

Defendants, along with two non-moving co-defendants, are charged in the above-captioned indictment (the "Indictment") with one count of conspiracy to possess with intent to distribute heroin and cocaine in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846, and one count of conspiracy to interfere with commerce by threats or violence in violation of 18 U.S.C. § 1951(b)(1) and (b)(3). Defendants Chappelle, Bonner, and Speller are also charged in the Indictment with one count of possession of a firearm during a crime of violence and drug trafficking offense in violation of 18 U.S.C. §§ 924(c)(1)(A)(i) and 2.

Defendants allege that the Government utilized a plan, common to a number of other otherwise unrelated cases, to lure Defendants into attempting to commit a drug-related armed robbery. A confidential source, referred to pseudonymously as "CS–1" in the underlying Complaint (13 Mag. 2712), informed agents of the Government that Davis and his crew, apparently including the other Defendants, had committed robberies of drug dealers in the past and were capable of committing the violent robbery that was allegedly the object of the charged conspiracy. The Gov-

---

1. Because the Court accepts as true all of the facts proffered by the Defendants, and nonetheless finds that the Government's alleged conduct does not render the indictment constitutionally defective, a hearing need not be held. *Cf. United States v. Cuervelo*, 949 F.2d 559, 567 (2d Cir.1991) ("[C]onducting a hearing is the preferred course of action in cases where disputed factual issues exist.").

ernment's plan was to introduce Davis to a confidential witness, referred to as "CW–1" in the Complaint, in order to entice Defendants into traveling from Philadelphia to New York City with the intention of intercepting and robbing a fictitious group of drug couriers supposedly traveling with large quantities of cocaine and heroin from Miami to New York City. CW–1 arranged with Davis for a meeting with the other Defendants on October 24, 2013, to discuss the robbery. CW–1 met with defendants Chappelle and Bonner at a McDonald's restaurant in Manhattan. CW–1 warned Defendants that the couriers were armed and dangerous, and encouraged Defendants to bring firearms for the robbery. CW–1 and an unnamed "partner" (actually a team of Government agents) were the architects and instigators of the robbery and drug distribution conspiracies. CW–1 provided the amount of drugs, the timing of the robbery, and suggested that the Defendants should "come ready, [because] they got guns." (Def. Mem. Supp., docket entry no. 66, at 10.) This statement, Defendants allege, was designed to ensure that the Government could charge Defendants with possession of a firearm during a crime of violence and drug trafficking offense.

The Government alleges in its opposition papers that, at the October 24, 2013 meeting, Bonner and Chappelle made clear that they were experienced robbers of drug dealers, and that they asked CW–1 for the details of the robbery plan. Furthermore, the Government alleges that Bonner stated "I can move like 10 [kilograms] a week easy" and "I can move the heroin or the coke, but it has got to be grade A." (Gov't Opp., docket entry no. 80, at 5–6.) The Government alleges that Chappelle insisted on an allocation of the expected profits of the robbery, 60% for Defendants and 40% for CW–1, because he had to pay a portion to "Ty" (Davis) for arranging the meeting of Defendants and CW–1. The Government also proffers that CW–1 did not provide the weapons to the Defendants. Defendants do not dispute these allegations.

After a series of phone calls and another meeting on November 7, 2013, CW–1 and Defendants finalized the details of the robbery and planned it for November 18, 2013. On November 18, 2013, Chappelle, Bonner, Speller and two non-moving co-defendants traveled from Philadelphia to Manhattan, arriving in the afternoon. Defendants allege that the Government allowed the Defendants to roam Manhattan, armed and unsupervised, until the planned robbery at 8:30 p.m.

On the evening of November 18, 2013, Bonner, Chappelle, Speller and two non-moving co-defendants made their way to the prearranged robbery location in three vehicles. Government agents stopped the vehicles and arrested Bonner, Chappelle, Speller and two co-defendants.[2] The Government agents found five firearms in two

---

**2.** Davis was not present at the scene of the robbery and was arrested on February 12, 2014.

In an affirmation filed by counsel and signed by Chapelle only, Chapelle alleges that the stop of the vehicles was made forcibly, at gunpoint, and that the defendants were forcibly removed from the vehicles, handcuffed and forced to lie down in the street. Chapelle further alleges that a DEA agent's sworn statements in the Complaint deliberately mischaracterized the circum-

stances of the arrest and, purportedly acting on behalf of "defendants," requests a *Franks* hearing. Chapelle's counsel has not briefed these issues and no other defense counsel has made such a request. The Court will not address any legal issues raised solely in Chapelle's *pro se* submission. *See United States v. Tutino*, 883 F.2d 1125, 1141 (2d Cir.1989) (decision to grant or deny "hybrid representation" is within discretion of the trial court).

hidden compartments in two of the vehicles in which the five defendants were driving or riding. The Government also found two ski masks, a pair of handcuffs, and zip ties (plastic restraints).

Defendants proffer that the Government has employed a similar strategy to ensnare other people in at least 15 investigations, resulting in the arrest of 66 defendants in various states. Because the scheme has been employed in other cases, Defendants argue that they could not have been "[t]argeted in any meaningful way." (Mem. in Supp. at 5.) Defendants also allege that, in another case, this common strategy led to a shooting of one of the suspects on a public street, and that a federal prosecutor lied to a district judge in another case. Defendants do not allege that any such violence or official misrepresentations were perpetrated in connection with this Indictment but, nonetheless, contend that the conduct of the investigation here, seen in the context of the similar cases, warrants dismissal of the Indictment for outrageous government conduct.

## DISCUSSION

*The Application for Dismissal of the Indictment*

■■■ The Fifth Amendment to the Constitution of the United States provides, in pertinent part, that: "No person shall ... be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. In *Hampton v. United States,* 425 U.S. 484, 493–94, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976), the Supreme Court recognized the possibility that government involvement in a crime might become so "outrageous" that it violates the Fifth Amendment Due Process rights of a defendant. *See also United States v. Al Kassar,* 660 F.3d 108, 121 (2d Cir.2011) ("Government involvement in a crime may in theory become so excessive that it violates due process and requires the dismissal of

charges against a defendant even if the defendant was not entrapped."). To establish a violation of due process on this basis, a defendant must show government conduct so outrageous that "common notions of fairness and decency would be offended were judicial processes invoked to obtain a conviction." *Al Kassar,* 660 F.3d at 121 (quoting *United States v. Schmidt,* 105 F.3d 82, 91 (2d Cir.1997)); *see also United States v. Bout,* 731 F.3d 233, 238 (2d Cir. 2013) (same). "Generally, to be 'outrageous,' the government's involvement in a crime must involve either coercion or a violation of the defendant's person." *Al Kassar,* 660 F.3d at 121 (citing *Schmidt,* 105 F.3d at 91); *United States v. Rahman,* 189 F.3d 88, 131 (2d Cir.1999) ("The paradigm examples of conscience-shocking conduct are egregious invasions of individual rights.").

■■■ Defendants' burden is a heavy one because courts are required to be deferential to the Government's "choice of investigatory methods." *See Rahman,* 189 F.3d at 131 (internal citation omitted). "It does not suffice to show that the government created the opportunity for the offense, even if the government's ploy is elaborate and the engagement with the defendant is extensive. Likewise, feigned friendship, cash inducement, and coaching in how to commit the crime do not constitute outrageous conduct." *Al Kassar,* 660 F.3d at 121 (internal citations omitted). Therefore, even a sting operation that involves "government creation of the opportunity to commit an offense, even to the point of supplying defendants with materials essential to commit crimes, does not exceed due process limits." *United States v. Cromitie,* 727 F.3d 194, 219 (2d Cir. 2013), *cert. denied,* —— U.S. ——, 135 S.Ct. 53, 190 L.Ed.2d 55 (2014). Moreover, "[t]he Second Circuit has 'yet to identify a particular set of circumstances

in which government investigative conduct was so egregious that it shocked the conscience and violated fundamental guarantees of due process.'" *United States v. Sessa*, No. 92CR351, 2011 WL 256330, at *39 (E.D.N.Y. Jan. 25, 2011) (quoting *United States v. Heyward*, No. 10CR84, 2010 WL 4484642, at *3 (S.D.N.Y. Nov. 9, 2010)), *aff'd*, 711 F.3d 316 (2d Cir.2013).

■ Defendants allege no facts indicative of coercion, intimidation, or use of physical force by the Government agents in this case. Defendants rely principally on two decisions from the Central District of California insofar as they argue that the sting that resulted in their indictment violated their due process rights. Both decisions purport to apply a Ninth Circuit standard that places the burden of disproving outrageousness on the government, and each is factually distinguishable.[3] Neither decision persuades this Court that further inquiry is warranted in this case as to whether the Government violated defendants' rights in its work with CW–1, his contact with Davis, and the subsequent interactions with Defendants recruited by Davis. Defendants do not dispute the Government's representations that it had received information indicating that Davis and a crew had robbed drug dealers in the past and were capable of committing a violent drug robbery, nor its representations that Bonner and Chappelle made clear their prior relevant drug robbery experience.

In terms of creation of the circumstances of the crime, the Government conduct alleged here is no more extensive than conduct that the Second Circuit has found to fall short of "outrageous conduct." In *United States v. LaPorta*, 46 F.3d 152, 154 (2d Cir.1994), government agents asked an informant to contact the defendant and arranged for him to burn and destroy a government vehicle. The Second Circuit held that this conduct was insufficiently outrageous to require a dismissal of the complaint. *Id.* at 161–62. In *United States v. Schmidt*, 105 F.3d 82, 85 (2d Cir.1997), the court found that Government agents did not violate a defendant's due process rights when the agents posed as hit men, accepted a prisoner's solicitation to murder two government agents during an escape, and then conducted a fabricated prison breakout. Indeed, courts in the Second Circuit routinely uphold convictions on indictments for narcotics stash house robbery stings, each similarly created by the government. *See, e.g., United States v. Tribble*, 320 Fed.Appx. 85, 87 (2d Cir.2009) ("Although the DEA concocted and executed an elaborate ruse by inviting the defendants to rob a stash house that did not in fact exist, we conclude that such conduct does not rise to the level of being 'so outrageous that common notions of fairness and decency would be offended were judicial processes invoked to obtain a conviction against the accused.'") (internal citation omitted); *United States v. Borrero*, No. 13CR58, 2014 WL 5438039, at *3 (S.D.N.Y. Oct. 27, 2014) (holding that a reverse sting involv-

---

**3.** Both California cases arose from "stash house" reverse stings. According to the district courts' findings, government agents and cooperators used entirely fabricated stories of drug courier activity and stash house vulnerability to actively recruit impoverished individuals whom the authorities had no proper basis for suspecting were involved in drug activity, luring them into action in connection with the schemes by using promises of easy money, and even enticing them to acquire guns. *See United States v. Hudson*, 3 F.Supp.3d 772 (C.D.Cal.2014); *United States v. Roberts*, No. CR 13–00751–R–2,3,5 (C.D.Cal. May 30, 2014). Both decisions are attached to Defendants' opening memorandum as exhibits.

ing robbery of a fictitious stash house did not violate due process).

It is clear from the proffered evidence that, although the Government designed the initial plan, Defendants undertook significant steps to arrange the details of the plan and to attempt to accomplish the goals of the conspiracy. *See Heyward,* 2010 WL 4484642, at *4 (noting that "the government must actively 'engineer' and 'direct' the charged offense from beginning to end for a due process challenge to succeed."). Indeed, merely creating the opportunity for a crime is insufficient to raise due process concerns. *See Al Kassar,* 660 F.3d at 121. Defendants certainly acted to propel the conspiracy forward, arranging for their own weapons, discussing in some detail the disposition of the narcotics, and negotiating the allocation of the proceeds. The fact that the Government concocted the initial plan to rob imaginary armed drug couriers is thus insufficient to render the Indictment constitutionally defective.

Defendants further argue that the Indictment should be dismissed as the product of outrageous government conduct toward third parties, citing the Second Circuit's expression in *United States v. Chin,* 934 F.2d 393, 399 (2d Cir.1991), of "very serious concerns with respect to the rights of third-parties" in evaluating the constitutionality of a government investigation. In that case, which involved a sting focused on child pornography, the Second Circuit's particular concern was whether, in encouraging a defendant to acquire child pornography, the government had "encouraged [the defendant] to go out and commit a *real* crime, with *real* victims [ (*i.e.,* minors who had been exploited in the production of pornographic images, the demand for which is increased when persons purchase them) ], just so [the defendant] could be arrested and prosecuted." The *Chin* Court cited

Judge Friendly's opinion in *United States v. Archer,* 486 F.2d 670, 676–77 (2d Cir. 1973), a seminal statement of this concern: " 'It would be unthinkable ... to permit government agents to instigate robberies and beatings merely to gather evidence to convict other members of a gang of hoodlums. Governmental 'investigation' involving participation in activities that result in injury to the rights of its citizens is a course that courts should be extremely reluctant to sanction.' " 934 F.2d at 400. In neither case, however, did the court dismiss an indictment based on a finding that the government had caused injury to third parties through its investigative activities. Defendants also cite *United States v. Koschtschuk,* No. 09CR0096, 2011 WL 867569 (W.D.N.Y. March 10, 2011), in which the court ordered an evidentiary hearing after evidence came to light indicating that a government confidential source may have been an instigator and active participant in an assault that was a predicate for a charge of racketeering.

The Government committed outrageous conduct here, Defendants argue, by structuring the sting in a manner that potentially exposed innocent third parties to danger insofar as Defendants were encouraged to acquire guns and travel, armed, from Pennsylvania to New York for the fictitious robbery. Defendants point out in this connection that, in an otherwise unrelated case that arose from the same sort of sting operation, a suspect who emerged from a vehicle armed was shot by a police officer during a traffic stop on a public street. While the Court is, like any citizen, deeply concerned about the potential for injury to innocent bystanders in connection with law enforcement activity, conducting an investigation that poses a risk of such potential injury is not "outrageous" government conduct that would warrant dismissal of an indictment of persons who,

like Defendants, allegedly violated the law by acquiring and carrying firearms with the intent of committing a potentially violent robbery of a drug dealer. There is no indication that the Government instigated any actual injury to any actual third party, much less one that itself would have formed the basis of the charged criminality. To the extent the Government encouraged the Defendants to come prepared to do harm to a drug dealer, no such person was actually endangered because the drug dealer was imaginary. Furthermore, the Government represents that it took steps to monitor Defendants' activities and to minimize any potential danger to third parties at the scene of the planned takedown.

Far from being "outrageous" in connection with the rights of third parties, the investigation in the instant case was intended to remove from the public streets guns and persons who were alleged to have engaged in violent robberies in the past and allegedly intended to continue to engage in that behavior. Law enforcement activity of this type is consistent with protection of the rights of the general public and the integrity of the judicial system is not sullied by the adjudication of charges arising from such investigative conduct.

Defendants' motion is denied insofar as it seeks dismissal of the Indictment.[4]

*The Government's Disclosure Obligations*

Defendants seek immediate disclosure of Jencks Act and *Giglio* materials related to CW–1 and CS–1 and of their identities.[5]

At a conference held on October 30, 2014, the Government proffered that it intends to call CW–1 and CS–1 as witnesses at the trial and will reveal their identities a week before trial, in its production of *Giglio* material. The Court approved the Government's proposed disclosure of *Giglio* materials one week before trial, and the Government undertook to disclose Jencks Act materials by 12:00 p.m. of the Friday before the trial. The Court finds that this disclosure schedule comports with Defendants' due process rights.

### CONCLUSION

For the foregoing reasons, Defendants' motion is denied in its entirety. The final pretrial conference in this case remains scheduled for January 6, 2015, at 2:15 p.m. in Courtroom 12D.

This Memorandum Opinion and Order resolves docket entry numbers 64, 73, 78, and 87.

SO ORDERED.

---

4. Nothing in this Opinion and Order precludes Defendants from asserting an entrapment defense at trial.

5. The Government has undertaken to produce all evidence that is exculpatory within the meaning of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), immediately. (Mem. in Opp. at 25 n. 11.)