**Ginger LABENSKY, Plaintiff,**

v.

**The COUNTY OF NASSAU, Samuel Rozzi, Nassau County Police Department, Aaron Cohen, Michael Yowhan, Michael O'Leary, Defendants.**

No. 93–CV–3123 (JG).

United States District Court, E.D. New York.

March 11, 1998.

Irwin Rochman, Jonathan C. Moore, New York City, for Plaintiff.

Paul F. Millus, Charles D. Cunningham, William H. Pauley, III, Snitow & Pauley, New York City, for Defendants, County of Nassau and Nassau County Police Department.

Elliot Cohen, Parker Chapin Flattau & Klimpl, New York City, for Defendant Aaron Cohen.

Ronald J. Morelli, Mulholland Minion & Roe, Williston Park, NY, for Defendant Michael Yowhan.

Bruce R. Cozzens, Jr., McCabe & Cozzens, Mineola, NY, for Defendant Michael O'Leary.

## MEMORANDUM AND ORDER

GLEESON, District Judge.

On July 14, 1993, Ginger Labensky commenced this action, seeking relief for alleged violations of the Civil Rights Act of 1871, 42 U.S.C. §§ 1983 and 1988, and the laws and Constitution of the State of New York. Her claims include false arrest, false imprisonment, malicious prosecution, conspiracy, abuse of process, retaliation and outrageous governmental conduct in violation of the Due Process Clause of the Fourteenth Amendment. The claims arise out of an undercover operation that led to Labensky's arrest.

Defendants have moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons set forth below, the motion is granted.

### Facts

A. *Labensky's Relationship With Aaron Cohen*

The relationship between Labensky and defendant Aaron Cohen, a confidential informant for the Nassau County Police Department ("NCPD"), began in March 1991, while both were working at the Young Women's Hebrew Association ("YWHA") in East Hills, New York. Labensky, who is 37 years old, had been employed at the YWHA for 12 years, working in educational programs with children and retarded adults. Cohen worked as a weight training instructor in the YWHA gym.

Cohen had been an informant for the NCPD since August 1990. Civic duty was not his motivation. He was a drug dealer facing drug charges, and he was working for leniency by assisting in the ongoing investigation of the Pagans, a motorcycle gang that has long been targeted by the NCPD and other law enforcement agencies because its members are suspected of trafficking in cocaine and other controlled substances. Cohen had relationships with members and associates of the Pagans, and his assistance led to at least 20 arrests.

Cohen's informant activities were directed by defendants Michael O'Leary and Michael Yowhan, detectives assigned to the NCPD Narcotics Bureau. As part of those activities, Cohen attended the April 1991 funeral of Larry Carnelli, a Pagan member who was murdered by another gang member. Labensky also attended the funeral. Police surveillance photographs depict her wearing Pagan "colors" which identified her as Pagan "property." Cohen recognized Labensky as a co-worker and initiated contact with her. Cohen's primary motivation for the commencement and continuation of his relationship with Labensky was to fulfill his duties as an informant for the NCPD.

Labensky had longstanding ties to Pagan members. She had dated one, Anthony Papa, in approximately 1984. Beginning in 1985, she had a lengthy and close relationship with another Pagan, Joe Zapulla. The relationship lasted more than five years. During most of that time, Zapulla was incarcerated on a federal narcotics conviction. Labensky visited him almost every weekend at the federal prison in Lewisburg, Pennsylvania. In May 1988, on her thirtieth birthday, they were engaged. For a short period of time after his release from prison, Zapulla resided with Labensky at her parents' home. The relationship with Zapulla ended in August 1990, approximately eight months before Labensky met Cohen. In addition, Labensky's sister is married to Wayne Ithier, a Pagan member and reportedly an officer of its national organization. Finally, Labensky was allegedly a frequent visitor to the Pagan clubhouse in Farmingdale, New York.

After their initial meeting, the relationship between Cohen and Labensky quickly matured. Cohen was eager to pursue the friendship with Labensky, and he succeeded. He began to work with Labensky in the YWHA gym, becoming her personal trainer. Cohen encouraged her to work out every day, and, according to Labensky, he helped to promote her self-esteem. Although their initial friendship focused on exercise sessions, by May 1991, Cohen began to see Labensky socially, outside of the gym.

On the first of these occasions, Cohen went to Labensky's house and cooked her dinner. Cohen brought live lobsters and wine and prepared the entire dinner by himself. Labensky was flattered; no man had ever done this for her before. Although her relationship with Cohen was never sexual, it quickly became a central part of Labensky's life. When Labensky had car problems, Cohen offered to sell his car to her at a discount. When Labensky's jacket was stolen, he offered her his leather jacket. When she refused, Cohen offered her fifty dollars to buy a replacement. Cohen discussed traveling to New Orleans on vacation with Labensky, and gave her advice on her diet and workout regimen. He gave her praise and input on her work at the YWHA, and when Labensky had an idea to start a business—holding children's parties at the YWHA—he encouraged her and provided business advice.

While this relationship blossomed, Cohen continued his informant relationship with the NCPD. Cohen introduced Labensky to "KC." a purported friend who was in fact Detective O'Leary. Over the next few months, O'Leary got to know Labensky quite well. Beginning in September 1991, O'Leary socialized with her at Chances, a bar she often visited, and called her on the telephone.

As a result of all these efforts by Cohen, Labensky had a renewed trust in men. After Cohen succeeded in gaining her trust, he began asking her for help in obtaining cocaine for him.[1] Labensky is not sure when Cohen's importuning began, but believes it was in or about June 1991. Labensky kept putting him off. He asked her constantly, and she constantly refused, but their friendship nonetheless remained close.

On December 23, 1991, Labensky and Cohen had a series of recorded telephone conversations about whether Labensky may have contracted the HIV virus. Apparently, an acquaintance of Labensky who was known to Cohen, had been afflicted with AIDS. Labensky was worried that one of her former boyfriends had an affair with this stricken individual, raising the possibility that Labensky had also contracted the AIDS virus. Labensky and Cohen spoke at length about this possibility. At first, Labensky hesitated to take a test to see if she had contracted the virus. However, Cohen talked Labensky into taking the test, and later accompanied her to the Planned Parenthood clinic so that she could do so.

On December 24, 1991, Labensky hosted a Christmas Eve Party. Although she had invited twenty friends, only Cohen, O'Leary and one other person attended. Labensky gave Christmas gifts to both Cohen and O'Leary. Labensky alleges that Cohen asked her why there was no cocaine or other drugs available at the party. Labensky claims that she again told Cohen that she did not use cocaine, and that she did not want to get it for him.

### B. *The Drug Purchases*

On December 26, 1991, Labensky finally relented. O'Leary met Labensky and Cohen at Chances (the bar), where O'Leary gave Labensky $200 to purchase cocaine for him. Labensky then drove to the home of Michael and Louise Graves, alleged drug dealers known to the NCPD. They drove with Labensky back to the bar. Labensky entered the bar and went directly to the bathroom. When she emerged from the bathroom, La-

---

**1.** Defendants dispute many of the facts set forth here. They intend to elicit evidence depicting a dramatically different relationship between Labensky and Cohen, one in which she approached Cohen about selling him cocaine or marijuana and about escorting him to a methamphetamine laboratory in upstate New York to purchase methamphetamine. Defendants also intend to elicit Labensky's post-arrest statements admitting, *inter alia,* that she had sold cocaine to others.

bensky handed O'Leary a bag containing .062 ounces of cocaine.

After this initial purchase, Cohen continued to press Labensky to obtain cocaine, and Labensky did so. On January 17, 1992, Labensky met with O'Leary and Cohen in the YWHA parking lot. O'Leary gave Labensky $375 to purchase cocaine. Labensky told O'Leary that she would call him later that day, after she received the drugs. On the following day, Labensky told O'Leary by telephone that she was waiting for someone to deliver the "product." On January 19, 1992, Labensky delivered 5 grams of cocaine to O'Leary at Labensky's apartment in Westbury, New York. On February 13, in Labensky's car, O'Leary purchased from Labensky one-half of a gram (0.016 ounces) of cocaine for $40. On February 25, 1992, O'Leary arranged to purchase five "eight-balls" of cocaine from Labensky.[2] O'Leary gave Labensky $800, and on February 26 she delivered to him 17.5 grams (.0631 ounces) of cocaine. Labensky told O'Leary, in a recorded conversation, that Labensky's source told her to tell O'Leary that he could "cut" the cocaine with inositol.

Labensky claims that she was not "selling" the cocaine to O'Leary, since she obtained the drugs for O'Leary as a favor to him and Cohen. Labensky contends that she did not profit from the sales.

### C. Labensky's Arrest And Cooperation

On March 17, 1992, Labensky was arrested by Detective Yowhan and other members of the NCPD. She was charged with possessing a narcotic drug with intent to sell. Labensky's car was searched at the time of her arrest, and .15 ounces of cocaine was seized. A subsequent search of her apartment yielded the remains of numerous burnt marijuana cigarettes, a plastic bag containing 1.49 ounces of marijuana and a plastic bag containing a tablet of butabital, a barbiturate.

After her arrest, Labensky was brought to the "prisoner room" at the NCPD Narcotics Bureau. While there, Labensky met with Detective Yowhan, who explained the charges against her. Labensky alleges that Yowhan tried to frighten her by telling her that she faced life in prison if she did not cooperate with the NCPD's efforts to infiltrate the Pagans, but she could avoid prison entirely if she cooperated. According to Labensky, Yowhan told her that the NCPD knew she was not a drug dealer, but they needed her to wear a wire to obtain information on the Pagans. Labensky responded that she did not have intimate knowledge of the Pagans, and that she was not familiar with their business.[3]

Labensky also met that day with Nassau County Assistant District Attorney Joseph Burruano. Labensky alleges that Burruano told her that he knew that she was not a drug dealer, but her cooperation against the Pagans was necessary if she wanted to avoid a long prison sentence.

Labensky was not arraigned that day. She was not given a chance to consult with a lawyer during her six-hour detention at the NCPD Narcotics Bureau. Labensky claims that she decided to cooperate with the NCPD "as a result of the fear created by the pressure" exerted upon her. She was then released without being formally charged, a procedure designed to conceal the fact that she had been arrested. Keeping the arrest a secret would enhance her ability to cooperate effectively.

Labensky was directed to consult with the law firm of Collins, McDonald & Ganz. This referral was made by Detective Yowhan, who knew that two members of the firm were former Nassau County Assistant District Attorneys. Upon release, Labensky consulted with the firm, and she was advised to cooperate with the government. Within a week of her release, while wearing a recording device, Labensky attempted to purchase drugs from Louise Graves. The meeting, however,

---

**2.** "Eight-ball" is a slang term for one-eighth of an ounce.

**3.** Labensky admits that there were four occasions on which she "acted as a middle person" in

a cocaine deal, but claims to remember "very little of the particulars of each transaction." Plaintiff's Rule 3(g) Statement at 17–18.

did not occur because Graves had a death in the family.[4]

Shortly thereafter, on the advice of her parents, Labensky retained a new attorney, Robert Abrams. Abrams and Labensky met with Assistant District Attorneys Burruano and Harvey Melnicker to discuss further co-operation. However, after that meeting, La-bensky terminated her cooperation. On April 1, 1992, she was rearrested, formally charged and released after posting bail in the amount of $120,000.

### D. The Indictment

On May 13, 1992, Labensky was charged in a ten-count indictment with one count of Criminal Sale of a Controlled Substance in the Second Degree, three counts of Criminal Sale of a Controlled Substance in the Third Degree, four counts of Criminal Possession of a Controlled Substance in the Third De-gree and two counts of Criminal Possession of a Controlled Substance in the Fourth De-gree. Criminal Sale of a Controlled Sub-stance in the Second Degree is a Class A–II felony in New York, which carries a manda-tory minimum sentence of three years to life.

### E. The Dismissal of the Indictment

In May 1992, Assistant District Attorney Daniel Looney was assigned to Labensky's case. At that time, he interviewed Yowhan and O'Leary, and he requested from them all tapes that were made in the course of the investigation. O'Leary then gave Looney video tapes that the Narcotics Bureau made of two of the Labensky drug transactions and seven audio tapes related to those and the other two drug sales. In his initial inter-views with Yowhan, O'Leary and Cohen, Looney was not told of the extent of the relationship between Cohen and Labensky or between O'Leary and Labensky. Looney was also not informed that these were re-cordings made by Cohen of phone conversa-tions with Labensky that took place before the first drug transaction. In addition, Loo-ney was not aware that a recorder had been

attached to Cohen's phone as early as June 1991.

On July 27, 1992, Labensky moved for an order dismissing the indictment in the inter-ests of justice pursuant to New York Crimi-nal Procedure Law § 210.40, alleging that O'Leary and Cohen engaged in serious mis-conduct. This motion was initially opposed by the Nassau County District Attorney's Office. On December 15, 1992, the County Court ordered a hearing on Labensky's mo-tion. In preparation for the hearing, Looney made inquiries regarding the relationships between Cohen, Labensky and O'Leary. Looney learned from Cohen that a recording device had been installed on Cohen's tele-phone by the NCPD. Although this device was designed to capture every conversation made on the telephone, Cohen revealed that there were approximately 70 telephone con-versations with Labensky, made before the drug transactions, which were not recorded. Cohen told Looney that he disabled the de-vice because he believed that he was not required to tape conversations that did not involve drugs.

Additionally, Looney became aware of five additional tape-recorded conversations, oc-curring on December 22 and December 23, 1991, a few days before the first drug sale, which were not disclosed to the District At-torney's Office. While these tapes did not directly figure in the drug transactions, they, along with the fact that there were 70 previ-ously undisclosed phone calls, shed further light on the relationship between Cohen and Labensky. After learning these facts, Loo-ney believed that the relationship between Cohen and Labensky was "a much closer relationship" than he originally thought. Moore Affidavit, Exhibit 1 at 8.

▉ After the Nassau County District Attorney's Office reviewed and investigated the new information and the tapes that were not initially disclosed during the arrest and indictment process, it joined in Labensky's motion to dismiss the indictment in the inter-ests of justice. In an appearance before the County Court on February 8, 1993, Looney

---

4. Labensky testified at her deposition that she regularly met with her friend Louise Graves on Friday evenings at a place called Shadows. La-

bensky knew Graves was a cocaine dealer, but asserts that she did not approve of that conduct.

advised the court that his review of the recently-disclosed recordings of telephone conversations supported Labensky's contention that she had a close friendship with Cohen. Although Looney stated at one point that weaknesses in the cases prevented the People from proving the charges beyond a reasonable doubt, the substance of his remarks actually related to the affirmative defense of entrapment.[5] Eventually, the court clarified the basis for the prosecutor's decision:

> The Court: ... the defendant has, from the very outset here, raised a defense of entrapment?
>
> Mr. Looney: That's correct.
>
> The Court: And, I take it that the people have concluded, that that is a viable defense and, indeed, they could not overcome that defense?
>
> Mr. Looney: That is correct, Judge.

Moore Affidavit, Exhibit 1 at 7. The prosecutor further stated that the fact that there were numerous telephone calls between Labensky and Cohen that were not taped, viewed together with the tapes that lent credence to Labensky's claim of a close relationship with Cohen, led him to believe that the People "could not disprove" the defense of entrapment. *Id.* at 7–8. The court thereupon dismissed the indictment in the interest of justice pursuant to Criminal Procedure Law § 210.40. That provision requires a court to set forth its reasons for dismissal on the record, *see* § 210.40(3), and the court stated as follows:

> [T]he Court agrees with the Assistant District Attorney that, indeed, the public perception of the criminal justice system is certainly enhanced rather than suffering by reason of the granting of this type of motion.
>
> And, in this particular case, for the reasons outlined by defense counsel, when serious issues are raised it is certainly well and consistent with the prosecutor's application to thoroughly investigate the allegations made and present their findings to the Court.
>
> And, for all these reasons, the motion to dismiss is granted.

*Id.* at 7–8.

### F. The Current Action

On July 14, 1993, Labensky filed this action against Nassau County, Samuel Rozzi,[6] the Nassau County Police Department, Cohen, Yowhan and O'Leary. Labensky makes claims under 42 U.S.C. § 1983 alleging (1) denial of substantive due process; (2) false arrest; (3) false imprisonment; (4) malicious prosecution; (5) conspiracy; (6) abuse of process; and (7) retaliation. Labensky also makes functionally similar claims under the laws and Constitution of the State of New York.

## DISCUSSION

### A. The Standard for Summary Judgment

Summary judgment must be granted where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining whether material facts are in dispute, all of the plaintiff's properly

---

5. In federal court, the prosecutor bears the burden proving a defendant's predisposition beyond a reasonable doubt once a defendant has elicited evidence of government inducement. By contrast, under New York law, entrapment is an affirmative defense that must be proved by the defendant by a preponderance of the evidence. Section 40.05 of the New York Penal Law provides as follows:

> In any prosecution of an offense, it is an affirmative defense that the defendant engaged in the proscribed conduct because he was induced or encouraged to do so by a public servant, or by a person acting in cooperation with a public servant, seeking to obtain evidence against him for purpose of criminal prosecution, and when the methods used to obtain such evidence were as to create a substantial risk that the offense would be committed by a person not otherwise disposed to commit it. Inducement or encouragement to commit an offense means active inducement or encouragement. Conduct merely affording a person an opportunity to commit an offense does not constitute entrapment.

6. Rozzi, the Nassau County Police Commissioner, retired in January 1992, and died ten months later. By order dated October 13, 1993, plaintiff's claims against Rozzi were withdrawn by consent.

supported factual allegations are accepted as true, and ambiguities must be resolved and all inferences drawn in her favor. *Local 74, Service Employees International Union v. Ecclesiastical Maintenance Services,* 55 F.3d 105, 108 (2d Cir.1995).

The initial burden is upon the moving party to demonstrate the absence of any genuine issues of material fact. *Gallo v. Prudential Residential Services, Ltd.,* 22 F.3d 1219, 1223 (2d Cir.1994). "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citations omitted). The non-moving party cannot survive a properly supported motion for summary judgment by resting on his pleadings "without 'any significant probative evidence tending to support the complaint.'" *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (quoting *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 290, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)).

### B. *The Substantive Due Process Claim* [7]

Labensky claims that defendants violated her substantive due process rights under the Fourteenth Amendment to the United States Constitution when they entrapped her into procuring cocaine for O'Leary, and again when the NCPD withheld (from the prosecutor) evidence Labensky labels as "ex-culpatory." Labensky argues that she would not have committed the crimes with which she was charged but for the persistence of Cohen, who acted at the direction of O'Leary and other NCPD personnel. Labensky further argues that if the Nassau County District Attorney's Office had been made aware of this situation, charges never would have been brought against her.

The substantive due process protections of the Fourteenth Amendment function to curb (1) deprivations of life, liberty or property; (2) governmental abuse; and (3) unfairness or oppression caused by official behavior. *See Daniels v. Williams,* 474 U.S. 327, 330–31, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986). However, "[w]hile entrapment may be a proper defense in a criminal action, a police officer's participation in such activity does not constitute a constitutional violation." *DiBlasio v. City of New York,* 102 F.3d 654, 656–57 (2d Cir.1996) (quoting *Jones v. Bombeck,* 375 F.2d 737, 738 (3d Cir.1967)); *cf. Lewis v. Meloni,* 949 F.Supp. 158, 161–62 (W.D.N.Y.1996) (§ 1983 does not allow a claim for entrapment but plaintiff's claim survives summary judgment because, in essence, he alleges that police planted evidence on him).

There may be occasions, however, where police behavior is so shocking that it violates basic understandings of individual rights and the Due Process Clause of the Fourteenth Amendment. This notion that police conduct can constitute a violation of due process has its roots in the law of entrapment. In *Sorrells v. United States,* 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413 (1932), the Supreme Court adopted the subjective

---

7. Defendants assert that Labensky's due process claims are foreclosed by *Albright v. Oliver,* 510 U.S. 266, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994), in which the Supreme Court held that a § 1983 claim alleging arrest without probable cause must be analyzed under the Fourth Amendment. "Where a particular amendment provides an explicit textured source of constitutional protection against a particular sort of governmental behavior, that Amendment, not the more generalized motion of 'substantive due process,' must be the guide for analyzing these claims." *Id.* at 273, 114 S.Ct. 807 (*quoting Graham v. Connor,* 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) (internal quotation marks omitted)).

It may well be that substantive due process cannot supplement the specific procedural guarantees in the Bill of Rights. However, that issue is by no means free from doubt. *See id.* 510 U.S. at 288, 114 S.Ct. 807 (Souter, J., concurring) (the Due Process Clause is reserved for "otherwise homeless substantial claims"). Because I conclude that Labensky has failed as a matter of law to make out a due process claim, I need not decide whether such a claim is cognizable after *Albright. See also Ayeni v. Mottola,* 35 F.3d 680, 691 (2d Cir.1994), *cert. denied,* 514 U.S. 1062, 115 S.Ct. 1689, 131 L.Ed.2d 554 (1995).

approach to the defense. That approach focuses not on the government's conduct (except to the extent that it establishes an inducement to commit the crime), but on the defendant's predisposition to commit the crime. A predisposed defendant has no defense based on offensive governmental conduct. The Court rejected the "objective" view espoused by Justice Roberts' concurrence, which focused on government conduct and would have permitted judges to dismiss indictments of even predisposed defendants if the investigative tactics were sufficiently intolerable.

In *United States v. Russell*, 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973), the Court once again rejected the objective approach to entrapment. The Court emphasized that the defense did not authorize judges to dismiss prosecutions based on police conduct they found to be overzealous. Such a rule, the Court observed, would "give the federal judiciary a 'chancellor's foot' veto over law enforcement practices of which it did not approve." 411 U.S. at 435, 93 S.Ct. 1637. However, the Court observed that it "may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction." *Id.* at 431–32, 93 S.Ct. 1637.

In *Hampton v. United States*, 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976), the Court's plurality opinion recanted the "due process" defense envisioned by *Russell*'s dicta, and explicitly limited defendants who complain of government conduct to the entrapment defense. *Id.* at 490, 96 S.Ct. 1646. However, this effort failed to garner a majority of the Court. Rather, Justice Powell's concurrence stated that the Due Process Clause might be violated where "[p]olice over involvement in crime ... reach[es] a demon-

strable level of outrageousness." *Id.* at 495 n. 7, 96 S.Ct. 1646 (Powell, J., concurring).

■ The dicta in *Russell*, which was reaffirmed by the two concurring and three dissenting justices in *Hampton*, created the due process challenge to criminal prosecutions. Under it, even persons who are predisposed to commit a charged crime can move to dismiss the indictment on the ground that the government's investigative tactics were too offensive to tolerate. Although the Supreme Court has not yet held that such a right exists, and one court of appeals has held that it does not, *United States v. Tucker*, 28 F.3d 1420 (6th Cir.1994), *cert. denied*, 514 U.S. 1049, 115 S.Ct. 1426, 131 L.Ed.2d 308 (1995), our circuit has repeatedly recognized its existence. *See United States v. La Porta*, 46 F.3d 152, 159–60 (2d Cir.1994); *United States v. Cuervelo*, 949 F.2d 559, 564 (2d Cir.1991); *United States v. Chin*, 934 F.2d 393, 397 (2d Cir.1991).

However, "[s]uch a claim rarely succeeds." *LaPorta*, 46 F.3d at 160. A due process violation occurs only when the government's conduct, standing alone, is so offensive that it "shocks the conscience," *Chin*, 934 F.2d at 398 (internal quotations and citation omitted), and time has shown that the judicial conscience is sturdy. There are very few cases in which this demanding standard has been met.[8] and due process challenges have been routinely rejected on facts that are far more egregious than the facts alleged by Labensky. Taking the facts as she alleges them, the police conduct in this case did not violate the Due Process Clause.

1. *The Conduct Of The Investigation*

■ Labensky is outraged that a government informant developed a close friendship with her for the express purpose of enticing her into committing a crime. But this investigative technique is not unusual, and "poses far less serious concerns" than those raised

---

**8.** The most prominent is *United States v. Twigg*, 588 F.2d 373 (3d Cir.1978). In that case, the informant originated a scheme to manufacture methamphetamine, started the factory, rented the location, purchased almost all the supplies and manufactured the drug. The defendants ran errands and performed minor tasks at the informant's direction. The Third Circuit found the defendants' participation to be so *de minimis*, and the circumstances of the crime to be so manufactured, that it overturned the convictions on due process grounds. 588 F.2d at 380–81.

The continuing vitality of *Twigg* has been called into question by the Third Circuit. *See United States v. Beverly*, 723 F.2d 11, 12 (3d Cir.1983).

by brutal and offensive physical coercion. *United States v. Chin*, 934 F.2d at 399. For undercover techniques to succeed, police operatives must use relationships that are built on time, trust and emotion in order to gain access to the criminal activities of their targets. *See United States v. Simpson*, 813 F.2d 1462, 1466 ("To win a suspect's confidence, an informant must make overtures of friendship and trust and must enjoy a good deal of freedom in deciding how best to establish a rapport with the subject."), *cert. denied*, 484 U.S. 898, 108 S.Ct. 233, 98 L.Ed.2d 192 (1987). Common sense suggests that criminals will sometimes act on behalf only of people they know and trust. *See United States v. Gunter*, 741 F.2d 151, 153 (7th Cir.1984) (A drug dealer "who expects to stay out of jail is careful about to whom he sells."). The police frequently take advantage of their targets' misplaced trust in people they regard as friends. It may be a distasteful aspect of law enforcement, but it is certainly not a new one, *see, e.g., Hoffa v. United States*, 385 U.S. 293, 302, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966), and it is essential to many criminal investigations. Labensky's outrage at having been the subject of entrapment by her "friend" does not convert the police conduct into outrageous governmental conduct; "feelings of 'betrayal' are not the sort of injuries that constitute a violation of a defendant's rights under the Due Process Clause." *United States v. Chin*, 934 F.2d at 399.

■■■■ Labensky also makes much of the fact that she was targeted for investigation only because she had close relationships with members of the Pagans. However, initiating an investigation for the sole purpose of pressuring the target (using the resulting criminal charge as leverage) to assist in the investigation of others is a permissible law enforcement tactic. Indeed, Labensky could legally have been targeted with no purpose at all. The notion that the Due Process Clause requires some level of predication before the government may target a person

for investigation has been roundly rejected. *See, e.g., United States v. Chin*, 934 F.2d at 397; *United States v. Luttrell*, 923 F.2d 764, 764 (9th Cir.1991) (en banc), *cert. denied, Kegley v. United States*, 503 U.S. 959, 112 S.Ct. 1558, 118 L.Ed.2d 207 (1992); *United States v. Jones*, 976 F.2d 176, 182, (4th Cir. 1992), *cert. denied*, 508 U.S. 914, 113 S.Ct. 2351, 124 L.Ed.2d 260 (1993). If a law enforcement officer may select a target for investigation without any suspicion that the person has committed a crime, it follows that she may select a target who knows someone who has. *See United States v. Emmert*, 829 F.2d 805, 812 (9th Cir.1987) (rejecting due process challenge because even though the undercover agent did not know target was a drug dealer, he knew the target "was probably in a position" to know a drug dealer).

Here, it is undisputed that plaintiff had substantial connections to the Pagans and access to controlled substances.[9] The detectives had reason to believe that, with the assistance of a trusted friend who was willing to betray her, they could arrange for Labensky to make a criminal sale of a controlled substance. They also had reason to believe that she might provide assistance against the Pagans, just as Cohen had provided assistance against her, if she were facing serious drug charges. The detectives in this case did not invent this strategy, and it does not violate due process. *See, e.g., U.S. v. Steinhorn*, 739 F.Supp. 268, 274 (D.Md.1990) (rejecting due process challenge to charges arising out of sting operation allegedly motivated solely to force the defendant to cooperate against his father and other government officials).

That such a strategy is legally permissible does not necessarily make it a good idea. There is often a gap between what is legally permissible and what is right. Specifically, there are important practical limits to the strategy of targeting someone for the sole purpose of procuring her cooperation. First,

---

9. Labensky denies that she was a user of cocaine or a drug dealer during the pendency of the investigation. She testified at her deposition that she had used cocaine between 1986 (when her full-time employment at the YWHA began) and 1992 approximately five times, but then swore that she would never do it again. Labensky admits that she used marijuana during the period she was under investigation.

it is a bad way for investigators to start a relationship with a "cooperator." Investigators and prosecutors want willing, committed cooperation with the government team, and people who learn that they were targeted and prosecuted for the sole purpose of pressuring them into cooperating are not likely to feel good about joining the fold. Second, juries scrutinize not only cooperation agreements themselves, but the circumstances leading up to them, and their ability to acquit when they see repugnant government conduct acts as a brake on investigative behavior even where the Constitution does not. But these limits are solely practical, not constitutional; the targeting of one person for the purpose of furthering an investigation into another does not violate due process. A contrary holding would cast judges in the role of supervising criminal investigations. Prosecutors and investigators need supervision, but judges are ill equipped to provide it, and any attempt to do so would violate the principle of separation of powers.

■■■ Labensky's many refusals to sell drugs on multiple occasions does not mean, as Labensky contends, that the detectives "knew she had no predisposition" to sell drugs. *See* Plaintiff's Memorandum at 2. Drug dealers are generally very cautious, a characteristic that frequently results in refusals to sell drugs, especially to a new customer. An informant's persistence in such circumstances does amount to a violation of due process. *See United States v. Slaughter,* 891 F.2d 691, 696 (9th Cir.1989) (the use of an "attractive female" to strike up a personal relationship with defendant and then induce him to sell her cocaine did not violate due process despite his eleven separate refusals to do so); *United States v. Reynoso—Ulloa,* 548 F.2d 1329, 1339 (9th Cir.1977) (narcotics trafficking is such a sordid business, involving such low-caliber people, that the informant's threat to kill the target's friends, made when the target was having doubts about a drug deal, do not rise to the conscience-shocking level), *cert. denied,* 436 U.S. 926, 98 S.Ct. 2820, 56 L.Ed.2d 769 (1978). Indeed, in many cases, it does not even amount to entrapment. For example, in *United States v. Santiago–Godinez,* 12 F.3d 722 (7th Cir.1993), *cert. denied,* 511 U.S. 1060, 114 S.Ct. 1630, 128 L.Ed.2d 354 (1994), the informant asked the defendant if he knew anyone who could obtain large quantities of cocaine. The defendant responded that he did not want to be involved. The informant persisted, appealing to a friendship that made them "practically family." The informant repeated his request twice a week for the next four months. Finally, the defendant relented. In upholding the trial court's refusal to submit the entrapment defense to the jury, the Seventh Circuit rejected the defendant's reliance on the constant badgering by the informant: "it is well established in this circuit. . . . that the government's persistence in attempting to set up a drug transaction is not alone sufficient to carry the case beyond an ordinary opportunity [to commit a crime]." *Id.* at 729 (citing cases). *See also United States v. Scott,* 859 F.2d 792, 794 (9th Cir.1988) ("[R]epeated and persistent solicitation" to induce defendant to commit a crime is "conduct typical of an undercover investigation.").

There is no dispute that, based on the information supplied by Cohen to the detectives, they had ample suspicion that an investigation of Labensky might result in her committing drug offenses. The Due Process Clause did not require them to terminate the investigation when she initially refused Cohen's entreaties to sell her drugs. Plaintiff's counsel conceded as much at oral argument, but argued that the investigation became unconstitutional after some number of refusals to sell drugs to Cohen. Counsel could not identify the point at which the investigative effort became unconstitutional: "[A]t some point, I don't know when it is, maybe it's the fifth no or the 25th no or the 50th no, but over a period of seven or eight months, those repeated nos . . . gave rise to an inference . . . that they are dealing with a person who is not predisposed." February 28, 1997, Transcript at 32. Counsel further acknowledged that the target's background might permit the officers to elicit more "nos" before crossing the due process line. *Id.* at 32–33.

This argument defeats itself. It provides nothing to help law enforcement officers separate legitimate undercover investigations, which the law presumably at least tolerates,

if not encourages, from conduct that will both destroy the criminal case and subject the investigators to civil liability. It advocates precisely the sort of " 'chancellor's foot' veto" over judicially-disapproved law enforcement practices that the Supreme Court rejected in *Hampton*. " 'I know it when I see it' is not a rule of any kind, let alone a command of the Due Process Clause." *United States v. Miller*, 891 F.2d 1265, 1271 (7th Cir.1989) (Easterbrook, J., concurring).

■ In short, whether or not an investigation violates a target's due process rights "cannot depend on the degree to which the government action was responsible for inducing the defendant to break the law." *United States v. Chin*, 934 F.2d at 398. Rather, it requires the use of extreme, conscience-shocking physical or psychological coercion. There was no such conduct in this case. Short of that extreme conduct, "government agents may lawfully use methods that are neither appealing nor moral if judged by abstract norms of decency." *United States v. Slaughter*, 891 F.2d at 696; *see also United States v. Simpson*, 813 F.2d at 1466 (upholding decision to continue use of informant who had sexual relations with defendant).

Plaintiff's reliance on Judge Friendly's opinion in *United States v. Archer*, 486 F.2d 670 (2d Cir.1973), is misplaced. In that case, federal agents "manufactured jurisdiction" by arranging for interstate telephone calls to be made, and then, "[a]dding insult to injury," the "undercover agents lied to New York police officers and committed perjury before New York judges and grand jurors." *United States v. LaPorta*, 46 F.3d at 160 (citing *Archer*, 486 F.2d at 672). The Second Circuit has observed that the holding of *Archer* was carefully limited, and addressed a principle of federal criminal procedure, not due process. *United States v. LaPorta*, 46 F.3d at 160.

This case more resembles *LaPorta* than *Archer*. There is no contention that the government agents lied or committed other crimes. They simply orchestrated undercover drug transactions with the help of an informant. Labensky herself committed the "substantial jurisdictional act" of selling drugs. *LaPorta*, 46 F.3d at 160.

Indeed, the final defect in Labensky's challenge to the government's investigative conduct is her own conduct. This was not a case in which the government provided the defendant with both the drugs and a buyer, or created its own drug manufacturing or distribution business and induced a defendant to participate in it. When Labensky finally agreed to sell cocaine, she went to a source of cocaine without the assistance or direction of Cohen or O'Leary, "The fact that [the defendant] could procure cocaine from a known source independent of any direction from the government as to who to contact demonstrates that he had the ability to commit the crime and was poised to engage in drug trafficking given the opportunity." *United States v. Santiago–Godinez*, 12 F.3d at 730.

Of course, the issue before me is not whether Labensky was entrapped. I assume she was, notwithstanding the evidence to the contrary.[10] Rather, the issue is whether the conduct of this investigation fell within that outer fringe of law enforcement behavior that can be described as demonstrably outrageous. It plainly does not.

### 2. *The Alleged Withholding Of Evidence*

■ Labensky's due process claim is based in part on what she describes as the deliberate withholding by the police from the District Attorney's Office of "relevant exculpatory evidence." This argument does not withstand scrutiny.

The information that Labensky describes collectively as the "relevant exculpatory evidence" is (1) that Cohen and Labensky had been friends for nine months before the first drug sale; (2) that their relationship was close; (3) that there were tape recordings of

---

10. Based on the voluminous record before me, it is not clear that an entrapment defense would have been successful had the criminal matter gone to trial. Given the number of transactions, the length of time over which they occurred, Labensky's contemporaneous drug use, the drugs found in her car at the time of her arrest and the lack of physical coercion used by Cohen, Labensky may not have been able to satisfy her burden under New York law to prove an absence of predisposition to possess and sell drugs.

conversations between them that occurred before the first drug sale; and (4) that Cohen had not recorded all his calls with Labensky, as he was instructed to do.

None of this information was "exculpatory" within the commonsense meaning of that term. That is, none of it suggested that Labensky did not commit the crimes charged. Rather, it was relevant, if at all, to an affirmative defense she might raise, *i.e.,* entrapment.

As for the specific items of information, the fact of a nine-month relationship between the defendant and the informant, and even the fact that they were close friends, is unremarkable. These are common attributes of drug cases. Drug dealers get caught and, in an effort to obtain lenient treatment, sometimes serve up other drug dealers, who sometimes are close friends. It is an ugly business, but it is a necessary technique when investigating a type of crime that lacks a complaining victim. As counsel for Labensky acknowledged at oral argument, the prosecutors in this case naturally would assume there was "some previous history" between Labensky and Cohen. February 28, 1997, Transcript at 40.

The police officers' belated disclosure to the prosecutor of the five tape recordings from December 22 and 23 cannot amount to a constitutional violation. As described by plaintiff's own expert, Professor Gerard E. Lynch, a highly respected authority on criminal procedure, the tapes do not contain direct evidence of Cohen's importuning Labensky to sell drugs. Indeed, Professor Lynch describes as "debatable" the question whether the tapes were material, and states that they were arguably not even discoverable by Labensky under New York law. Report of Gerard E. Lynch ("Lynch Report") at 7 (attached as Exhibit 11 to the Moore Affidavit). In these circumstances, where the obligation to provide the tapes to *the defendant* is a matter of "subtle legal judgment" to be made by a prosecutor, *id.,* Labensky's assertion that the post-indictment provision of them *to the prosecutor* violated the Due Process Clause is tenuous indeed.

It bears emphasis that this case did not involve a disclosure violation with respect to Labensky herself. She was provided all of the subject information before trial (indeed, there was no trial). Moreover, all of the "withheld" facts were within her knowledge. She obviously knew the nature and extent of her relationship with Cohen, and of his importuning of her to sell drugs. Labensky's complaint, rather, is that there was a disclosure violation by the police with respect to the prosecutor. Even at that, there was no destruction of evidence by the police, and no egregious conduct of the sort involved in the cases cited by Labensky.[11] O'Leary testified that he had failed to disclose the tapes because he believed they contained no evidence of criminal activity. That assertion is supported by the tapes themselves, and plaintiff's conclusory assertion that O'Leary acted maliciously is insufficient to survive a motion for summary judgment.

More importantly, the Constitution does not micro-manage criminal investigations. It is undoubtedly true, as Professor Lynch asserts, that a competent prosecutor would have wanted all of the information in the police files, both in determining whether Labensky was a "worthy target" of a criminal prosecution and in preparing to meet potential defenses if charges were brought. Lynch Report at 4–6. 8. The world might be a better place if prosecutors could sift through the investigators' files to identify potential defenses in each case before bringing charges, and it may well be true that the charges in this case would not have been brought if that had occurred. But there is no authority for enshrining this ideal, which "is easier stated than applied," *id.,* in the Due Process Clause by reading it to impose disclosure deadlines on criminal investigators in their dealings with prosecutors.

---

**11.** *See, e.g., Goodwin v. Metts,* 885 F.2d 157, 160–61 (4th Cir.1989) (deputy sheriff fails to tell prosecutor that another person confessed to the crime for which he had arrested plaintiff), *cert. denied,* 494 U.S. 1081, 110 S.Ct. 1812, 108 L.Ed.2d 942 (1990); *Jones v. City of Chicago,* 856 F.2d 985 (7th Cir.1988) (deliberate suppression by police of, *inter alia,* statements of victim indicating defendant was innocent and statement by another individual that he might have committed the crime), *cert. denied,* 494 U.S. 108, 110 S.Ct. 974, 108 L.Ed.2d 93 (1990).

Finally, the belated disclosure of the fact that Cohen had numerous conversations with Labensky that Cohen chose not to record is not, either standing alone or in combination with the other "exculpatory" evidence, outrageous. Granted, it may have spelled doom for the case against Labensky. In a trial involving an entrapment defense, the selective recording of conversations between the defendant and the informant is a prosecutor's nightmare. The obvious defense argument is that the heavy-handed importuning (or worse) occurred during those conversations that were not recorded, and the absence of any good reason *not* to record all conversations lends strength to that argument. But, again, these are proof problems, and evidence-gathering problems. Even assuming that the belated disclosure of Cohen's decision to turn off the recorded device is properly imputed to the police, *see DiBlasio v. City of New York,* 102 F.3d at 659-60 (Jacobs, J., concurring) (informant's machinations cannot always be imputed to the police), the Due Process Clause neither mandates the use of investigative techniques nor governs the timing of the investigators' provision to prosecutors of the details of the evidence-gathering process.

### C. The False Arrest, False Imprisonment, and Malicious Prosecution Claims

Defendants argue that plaintiff cannot show the absence of probable cause for Labensky's arrest and, accordingly, her claims of malicious prosecution, false arrest and false imprisonment must fail. In response, Labensky argues that probable cause did not exist for her arrest because (1) she was entrapped by the defendants; (2) they knew that she was "innocent" of the crime; and (3) they withheld "exculpatory" evidence.

 Claims brought under 42 U.S.C. § 1983 are guided by the tort law of the forum state. *Russell v. Smith,* 68 F.3d 33, 36 (2d Cir.1995); *Singer v. Fulton County Sheriff,* 63 F.3d 110, 118 (2d Cir.1995), *cert. denied,* 517 U.S. 1189, 116 S.Ct. 1676, 134 L.Ed.2d 779 (1996). Under New York law, malicious prosecution claims have four elements: "(1) the initiation or continuation of a criminal proceeding against the plaintiff; (2)

termination of the proceeding in the plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for the defendant's actions." *Russell,* 68 F.3d at 36. False arrest and false imprisonment, also have four elements. *Benjamin v. United States,* 554 F.Supp. 82, 85 (E.D.N.Y.1982). These are: (1) the defendant had intended to confine the plaintiff; (2) the plaintiff was conscious of the confinement; (3) the plaintiff did not consent to the confinement; and (4) the confinement was not otherwise privileged. *Id.* (citing *Broughton v. State,* 37 N.Y.2d 451, 456, 373 N.Y.S.2d 87, 335 N.E.2d 310, *cert. denied, Schanbarger v. Kellogg,* 423 U.S. 929, 96 S.Ct. 277, 46 L.Ed.2d 257 (1975)). In addition, a plaintiff must demonstrate the absence of probable cause to prevail on claims of false arrest or false imprisonment. *Zanghi v. Village of Old Brookville,* 752 F.2d 42, 45 (2d Cir.1985) ("It is abundantly clear that a finding of probable cause will defeat state tort claims for false arrest, false imprisonment and malicious prosecution.").

 Probable cause to arrest exists when government officers have knowledge of, or reasonably trustworthy information about, facts and circumstances sufficient to warrant a person of reasonable caution to believe that an offense has been committed by the person to be arrested. *Golino v. City of New Haven,* 950 F.2d 864, 870 (2d Cir.1991), *cert. denied,* 505 U.S. 1221, 112 S.Ct. 3032, 120 L.Ed.2d 902 (1992). Probable cause requires only a "probability or a substantial chance of criminal activity, not an actual showing of such activity." *Illinois v. Gates,* 462 U.S. 213, 244 n. 13, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). "Officers have probable cause to arrest if they receive 'information from some person—normally the putative victim or eyewitness—who it seems reasonable to believe is telling the truth.'" *Thomas v. Culberg,* 741 F.Supp. 77, 80 (S.D.N.Y.1990) (quoting *Daniels v. United States,* 393 F.2d 359, 361 (D.C.Cir.1968)).

 In this case, probable cause existed for Labensky's arrest and prosecution. Labensky obtained and sold quantities of cocaine to Detective O'Leary on four different occasions over a period of more than two

months. Accordingly, there was at least a "substantial chance" that a crime was committed, thus supporting the initial decision to arrest and prosecute Labensky for criminal sale and criminal possession of controlled substances.

■■■■ An entrapment defense is available only to "a defendant who has committed all the elements of a proscribed offense." *United States v. Russell,* 411 U.S. 423, 435, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973). A claim of entrapment does not negate the commission of the crime charged or the existence of any element thereof. *Torres v. State of New York,* 228 A.D.2d 579, 644 N.Y.S.2d 748, 750 (2d Dep't 1996); *People v. Millard,* 90 A.D.2d 590, 456 N.Y.S.2d 201, 203 (3d Dep't 1982). It is an excuse for a crime, not a denial of one.

■■■■ The rule Labensky asserts is that a successful entrapment defense strips an otherwise lawful arrest of probable cause. This rule would have a serious adverse impact on police behavior. Under New York law, entrapment is an affirmative defense. Thus, the law permits the police to arrest a person who has been induced to commit a crime even if they cannot, at the time of arrest, prove predisposition. Indeed, the police may then conduct further investigation into the defendant's background—including steps that cannot be taken during the covert phase of the investigation—in a search for evidence that might rebut an affirmative defense of entrapment. If a successful entrapment defense strips the initial arrest of probable cause, as Labensky argues, police officers will be deterred from making such arrests and pursuing such investigations. The rule Labensky seeks would, in effect, tell the officers that a defense that might later be raised could retroactively render the arrest itself illegal, subjecting the officer to civil liability. Indeed, even if the officer believed she had proof of predisposition at the time the crime was committed, she might refrain from making the arrest out of a fear that an entrapment defense might succeed,

subjecting the officer to the prospect of civil liability.

■■■ Labensky further contends that "relevant exculpatory evidence" was withheld by Cohen, O'Leary and the NCPD. However, as set forth above, this evidence would not have negated any of the elements of the crimes charged. It demonstrates only that Labensky procured cocaine at the request of a friend in whom she had misplaced trust. It does not demonstrate that no crime was committed, nor does it create a lack of probable cause. Section 1983 protects the rights, privileges and immunities secured by the Constitution and laws of the United States. Entrapment does not violate any of those. *Johnston v. National Broadcasting Co.,* 356 F.Supp. 904, 908 (E.D.N.Y.1973) Therefore, I grant defendants' motion for summary judgment with respect to Labensky's claims of false arrest, false imprisonment and malicious prosecution.[12]

### D. *Abuse of Process*

■■■ "The torts of malicious prosecution and abuse of process are closely allied. While malicious prosecution concerns the improper issuance of process, '[t]he gist of abuse of process is the improper use of process after it is regularly issued.'" *Cook v. Sheldon,* 41 F.3d 73, 80 (2d Cir.1994) (quoting 2 Committee on Pattern Jury Instructions, Association of Supreme Court Justices, New York Pattern Jury Instructions § 3:51 at 816 (1968)). At oral argument, plaintiff clarified her abuse of process claim, stating that it was predicated on the District Attorney's decision to indict Labensky. Labensky claims that the decision to prosecute was based solely on her unwillingness to cooperate with the NCPD. However, decisions to indict arrested suspects who refuse to cooperate, or who cease cooperating, is not improper. As set forth above, the indictment was amply supported by probable cause. Therefore, Labensky's abuse of process claim is dismissed.

---

12. In addition, the criminal action against Labensky was dismissed in the interests of justice. As such, that termination "cannot provide the

favorable termination required as the basis for a claim of malicious prosecution." *Hygh v. Jacobs,* 961 F.2d 359, 368 (2d Cir.1992).

**178**

### E. Conspiracy

 A plaintiff will have an action for conspiracy under § 1983 when she can demonstrate that the defendants acted in concert to deprive a person of their constitutional rights. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). However, Labensky has not demonstrated that the defendants have violated her rights under the U.S. Constitution. Thus, the conspiracy claim is dismissed. *See Singer v. Fulton County Sheriff*, 63 F.3d 110, 119 (2d Cir.1995), *cert. denied*, 517 U.S. 1189, 116 S.Ct. 1676, 134 L.Ed.2d 779 (1996).

### F. Monell Claims

 In establishing municipal liability under § 1983, a plaintiff must demonstrate that there was an official policy or custom that deprived the plaintiff of rights, privileges or immunities secured by federal law or the U.S. Constitution. *See Parratt v. Taylor*, 451 U.S. 527, 535, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981). Labensky has not proved that defendants have violated her federal rights; therefore, there can be no municipal liability under *Monell v. Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

### G. Retaliation Claims

 Labensky claims that defendants "retaliated" against her by withholding "exculpatory" evidence from the District Attorney's Office. To establish a retaliation claim under § 1983, a plaintiff must demonstrate that (1) her conduct was constitutionally protected; and (2) that the protected conduct was a substantial or motivating factor in the state actor's decision to take action involving the plaintiff. *See Mount Healthy School District v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). Here, Labensky distorts the meaning of a § 1983 retaliation claim. She has not demonstrated that she has engaged in any constitutionally protected conduct. Indeed, the underlying conduct on which Labensky bases her claim was criminal, namely, selling cocaine to an undercover police officer. Accordingly, Labensky cannot establish a retaliation claim under § 1983.

### H. Pendent State Law Claims

 Labensky's malicious prosecution, false arrest and false imprisonment claims have already been addressed as § 1983 claims. For the reasons stated above, the claims have no basis as state law claims. In addition, Labensky raises a claim of intentional infliction of emotional distress. To establish such a claim, Labensky must demonstrate that defendants' conduct was "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Fischer v. Maloney*, 43 N.Y.2d 553, 402 N.Y.S.2d 991, 373 N.E.2d 1215 (1978).

 Labensky was not the victim of outrageous government conduct; she was simply the target of a police undercover operation. She was never threatened in any way and she was never deprived of her power to refuse to procure cocaine for O'Leary and Cohen. Any emotional distress felt by Labensky was of her own making.

### CONCLUSION

For the forgoing reasons, defendants' motion for summary judgment is granted.

So Ordered.