**UNITED STATES of America,**

v.

**James CROMITIE, David Williams, Onta Williams and Laguerre Payen, Defendants.**

**No. 09 Cr. 558 (CM).**

United States District Court, S.D. New York.

May 3, 2011.

See also —— F.Supp.2d ——, 2011 WL 1842219 (S.D.N.Y.2011).

**213**

David Seymour Leibowitz, David Alan Raskin, Eric James Snyder, Adam Sean Hickey, U.S. Attorney's Office, New York, NY, Jason P.W. Halperin, U.S. Attorney's Office, White Plains, NY, for United States of America.

Kerry Andrew Lawrence, Vincent L. Briccetti, Briccetti, Calhoun & Lawrence, Theodore Samuel Green, Green & Willstatter, White Plains, NY, for Defendants.

## DECISION AND ORDER DENYING DEFENDANTS' RENEWED MOTION TO DISMISS THE INDICTMENT BASED ON OUTRAGEOUS GOVERNMENT MISCONDUCT

McMAHON, District Judge:

Defendants renew a motion, made and denied without prejudice prior to the trial, to have the indictment dismissed on the ground that the Government "created the criminal, then manufactured the crime." (Cromitie Br at 1).

There is some truth to that description of what transpired here. Nonetheless, the motion is denied.

*The Law Pertinent to the Motion*

The notion that government misconduct could warrant dismissal of an indictment traces back to a remark made by the United States Supreme Court in *United States v. Russell,* 411 U.S. 423, 431–32, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973). In *Russell,* the high court posited that it might "some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial process to obtain a conviction." Although a plurality of the court said, in *Hampton v. United States,* 425 U.S. 484, 490, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976), "If the police engage in illegal activity in concert with a defendant beyond the scope of their duties the remedy lies, not in freeing the equally culpable defendant, but in prosecuting the police under the applicable provisions of state or federal law," Justice Powell, concurring in the judgment, preserved the idea that due process might set some outer limit of government involvement in criminal conduct. *Id.* at 491–95, 96 S.Ct. 1646. However, he emphasized that, "Police involvement in crime would have to reach a demonstrable level of outrageousness before it could bar conviction."

However, outrageous government misconduct is "an issue frequently raised that seldom succeeds." *United States v. Schmidt,* 105 F.3d 82, 91 (2d Cir.1997). The First Circuit has gone so far as to call the doctrine "moribund" because "in practice, courts have rejected its application with almost monotonous regularity," *United States v. Santana,* 6 F.3d 1, 4 (1st Cir.1993). The Seventh Circuit has gone even further; it announced some years ago that "the doctrine does not exist in this circuit." *United States v. Boyd,* 55 F.3d 239, 241 (7th Cir.1995). While our Circuit has not gone so far, recognizing the doc-

trine "in principle," it has announced that "only Government conduct that shocks the conscience can violate due process," *United States v. Rahman*, 189 F.3d 88, 131 (2d Cir.1999). Needless to say, the Circuit has never seen any conduct that it considers conscience-shocking.

■ Significantly for this case, the Second Circuit has held:

> [W]hether investigative conduct violates a defendant's right to due process cannot depend on the degree to which the governmental action was responsible for inducing the defendant to break the law. Rather, the existence of a due process violation must turn on whether the governmental conduct, standing alone, is so offensive that is "shocks the conscience" regardless of the extent to which it led the defendant to commit his crime.

*United States v. Chin*, 934 F.2d 393, 398 (2d Cir.1991). The outrageousness of the government's conduct must be viewed "standing alone" and (of utmost importance here) *without regard to the defendant's criminal disposition. United States v. Cuervelo*, 949 F.2d 559, 565 (2d Cir.1991). Governmental instigation of criminal activity does not violate the due process rights of predisposed defendants. *Chin, supra*, 934 F.2d at 398. Nor does a sting operation—even an elaborate one—violate a defendant's due process rights. *United States v. Lakhani*, 480 F.3d 171, 182–83 (3d Cir.2007). The due process clause "is not to be invoked each time the government acts deceptively or participates in a crime that it is investigating .... [because agents] often need to play the role of criminal in order to apprehend criminals Wide latitude is accorded the government to determine how best to fight

crime." *United States v. Mosley*, 965 F.2d 906, 910 (10th Cir.1992).

■ The Government suggests that the jury's verdict on entrapment—its finding that the defendants were predisposed to engage in criminal activity of the sort proposed to them by the Government—necessarily disposes of the outrageous government misconduct motion. It does not. The jury did not reject any contention that the Government was "overinvolved" in this case—the case was tried, and the charge was carefully crafted, to avoid submitting that question to the jury. Whether the Government's conduct in this case rises to the requisite (and rarely met) level of constitutional outrageousness presents an issue of law to be determined by the court; the jury never considered it.

■ The defendants bear the burden of demonstrating, by a preponderance of the evidence, that the indictment was the product of outrageous government misconduct. *United States v. Nunez–Rios*, 622 F.2d 1093, 1098 (2d Cir.1980). The parties agree that when considering this constitutional question the court is to view the evidence *de novo*, and that it is defendants' burden to prove, by a preponderance of the evidence, that that the Government's conduct was so outrageous as to violate their due process rights.[1] (Transcript of oral argument, March 24, 2011, at 70–73).

*Findings of Fact Relevant to the Outrageous Government Misconduct Motion*

While the findings of fact that follow duplicate in many ways the summary of the evidence prepared in connection with the companion motion pursuant to Fed. R.Crim.P. 29, it represents the court's

---

1. The Government argues that although it is ultimately an issue for the Court to decide *de novo*, "the Court would need to show respect for the jury's verdict to some degree, since certain facts have clearly been found beyond a reasonable doubt, in the same way that a court would show deference at sentencing based on the jury's finding." (Oral Argument Tr. at 72). I do not disagree.

view of the evidence after *de novo* review, rather than as viewed most favorably to the Government. It is, necessarily, more detailed than was the Rule 29 summary of evidence, and it varies in some particulars from the Rule 29 discussion.

### 1. Contacts Prior to the Formal Opening of an Investigation

Hussain and Cromitie had first met at the Masjid al-Ikhlas Mosque in Newburgh during the early summer of 2008. Hussain testified that he met Cromitie on June 13, 2008. (Tr. 675). This is corroborated in an FBI report prepared by Special Agent Fuller (3501–1) and in a recording of a conversation among Cromitie and his co-defendants on May 1, 2009, when he says that he first met Hussain "ten months ago."

There were a total of five meetings between Hussain and Cromitie (June 13, June 23, July 3, August 20, and October 10, 2008), before the F.B.I. began recording their conversations. The only version that we have of their first encounter is Hussain's, since Cromitie did not testify.

On June 13, Cromitie walked up to Hussain in the parking lot of the mosque and introduced himself as Abdul Rehman. *Id.* During the ensuing conversation, Cromitie gave Hussain his telephone number and his home address; told the CI about his family in Brooklyn and the Bronx; and said (falsely) that while he (Cromitie) was born in the United State, his father was born in Kabul, Afghanistan. Cromitie also claimed (again falsely) to have visited Afghanistan three times, most recently in 1995. *Id.*

Cromitie told Hussain that he wanted to go back to Afghanistan, both to obtain a wife (though he already has one) and because of all the "brothers killed in Pakistan and Afghanistan." Hussain prompted Cromitie, telling defendant that he recently was at Stewart Airport and that he spoke with a military employee who told him the transport planes were bringing military supplies to Afghanistan. Cromitie responded, "The weapons made today are used to kill Muslims," and complained that "the television news stations report on the deaths of a single soldier and not the hundreds or thousands of Muslims killed." He continued: "Look brother, I might have done a lot of sin but to die like a (shahid martyr), I will go to paradise.... I want to do something to America." *Id.* All of this testimony is confirmed by Special Agent Fuller's report (3501–1), which is based on what Hussain told Fuller about this first meeting.

The two men next met on June 23: Hussain picked up Cromitie at his apartment and drove defendant to a house on Shipp Street in Newburgh. The Shipp Street house was wired to record what went on in the living room and Hussain had previously used this house to meet with people he wanted to record. However, the June 23 meeting was not recorded. (Tr. 1592, 2907).

According to Hussain, Cromitie expressed hatred toward Jews and Americans at this meeting. (Tr. 1590, 2903–05). Special Agent Fuller's debriefing notes include references to Cromitie's anti-American comments: Cromitie stated he watched too many Muslims dying and said that he wanted to shoot President Bush seven hundred times. He referred to Bush as the anti-Christ, and asserted that if Allah did not kill him, then "a brother" will. *Id.*; (3501–3). Asked by Hussain about the 9/11 attacks, Cromitie purportedly claimed that no Muslims were involved, but one million Muslims were killed by the United States Government. *Id.* When asked if he followed the news from Quandahar, Afghanistan, Cromitie stated that he followed the news in Afghanistan every day. *Id.* All this testimony is confirmed by Fuller's notes.

But Fuller was apparently not told about the anti-Semitic comments that (according to Hussain's trial testimony) Cromitie made; his notes do not reflect them. (3501–3, 3502–12). Instead, the notes contain more biographical information about Cromitie's family and acquaintances, as well as entries about Cromitie's alleged criminal history—including a tall tale about Cromitie's dispute with a drug dealer, which ostensibly led Cromitie to shoot the dealer's son (using a gun obtained from a mythical sibling who was purportedly a New York City Police Officer). Cromitie claimed (falsely) to have spent 15 years in prison for this crime. As we know from the trial testimony, this and many other statements Cromitie made about his "violent" criminal past are pure fiction.

During this conversation, Hussain asked Cromitie, "What do you plan to do with your life?" Cromitie said that he was trying to straighten himself out, so he was working hard in the hardware department at Walmart and with the Newburgh Housing Authority, He also said he was praying five times a day and trying to be a good Muslim. (Tr. 687–88).

The two men met again at the Shipp Street house on July 3, 2008. Again, the meeting was not taped; we have only Hussain's testimony and Fuller's debriefing notes to establish what Cromitie said.

At this meeting, Hussain told Cromitie that he was a member of an Islamic terrorist organization in Pakistan called Ja-ish–e–Mohammed (JeM). Cromitie immediately said that he wanted to join JeM. (Tr. 690–91). Hussain told Cromitie that the leaders of JeM might ask him to assist in jihad; Cromitie responded that he had "no problem with Jihad" and "would be interested in joining." *Id.* Hussain's testimony about this conversation is entirely corroborated by the debriefing report for that day. (3501–5).

On August 20, Hussain met Cromitie at the latter's apartment and drove him to the Masjid Al–Ikhlas Mosque. According to the debriefing report, the men spoke about Islam and about Cromitie's Afghani father. Cromitie claimed that he was using his grandmother's last name, but said he intended to change it to his father's name some day. (3501–6).

Relying on Hussain's reports about Cromitie's statements, sometime in September 2008, the F.B.I. made a decision to open an investigation into Cromitie. (Tr. 150). The investigation was denominated "IT–Sunni Extremists" (3555–7), later renamed "Operation Redeye" (presumably, for the investigation's unprecedented use of video recording).

Prior to opening the investigation, the FBI does not appear to have checked out any of the verifiable aspects of Cromitie's story as reported to them by Hussain. For example, the FBI did not check to see if Cromitie really had traveled to Afghanistan; had it done so it would have learned not only that defendant had no passport, but also that no person named Cromitie had traveled from the United States to Afghanistan since 1982. The Government did not make inquiries about Cromitie's connections, either; had it done so, it no doubt would have learned that he was not of Afghan parentage and that he had no connections in that country at all. Apparently the Bureau did not run a criminal record check (N.Y. SID check) on Cromitie, either, or Agent Fuller would have learned that Cromitie's record consisted almost exclusively of illegal drug arrests— 4 felonies, 7 misdemeanors and 4 violations—with no crimes of violence, and certainly no murder of a drug dealer's son or any 15 year sentence.

### 2. The Period from October 2008 until February 24, 2009

The F.B.I. began recording Hussain's conversations with Cromitie on October 12,

during a meeting between the two men in Suffern, New York. (Tr. 151, 695; GX 101). Although Special Agent Fuller had directed Hussain to try to elicit "the same information provided from Cromitie during the discussions during the five previous unrecorded meetings," (Tr. 177), Cromitie said nothing about having told Hussain that he wanted to go to Afghanistan or to die like a martyr. To the contrary: when Hussain told Cromitie about reports of "mushriks" [infidels] killing Muslims in Pakistan, and advised defendant that the teachings of the Prophet Mohammed (the hadiths) permitted—even required—Muslims to commit violence against non-believers, Cromitie reacted by saying, "But what do we do? If you and me was to die today trying to do something .... it's not gonna change anything." (GX 101–E1). Cromitie also did not react favorably to Hussain's assurance that terrorist acts like the bombing of the Marriott Hotel in Pakistan would assure a Muslim's reception into Paradise. (GX 101–E3, E4).

Hussain was more successful at getting ·Cromitie to make anti-Semitic comments of the sort he testified were uttered during the unrecorded conversations. Hussain himself made a number of anti-Jewish remarks during this conversation. He said that the Prophet Mohammed had said that "to eat under the shadow of a Jew is like eating your mother's meat," and that "every evil in the world is because of the Jews." (GX 101, Def. Clip 326A, Tr. 1610–11). Hussain told Cromitie that things were "at a point, where you, me, all these brothers, have to come up with a solution to take the evil down." (GX 101–E5). Cromitie responded in kind. He can be heard on tape saying that Jewish people look at him "like they would like to kill me" whenever he (Cromitie) wore Muslim clothing, and said that this slight "makes me want to jump up and kill one of them." (GX 101–E2).

On October 19, Cromitie met with Hussain again. Cromitie again complained about the treatment he received from some Jews. Hussain responded that, according to the Prophet Mohammed, Jews "are responsible for all the evils in the world" and should be "eliminated." (GX 101–E1, Tr. 1613). Confronted with this inflammatory rhetoric, Cromitie backed off his earlier statement, saying, "They are responsible for that. I don't wanna go that far with him...." (GX 102–E1–T, Def. Clip 396). But defendant observed that, on the day of judgment (Yamkiyama), a Jew would learn that, "the Muslim will prosper." (GX 102–E1–T).

During this conversation, Hussain boasted of having done many things in Pakistan for the cause of Allah. He offered to spend money to help Cromitie do the same, so that Allah would "reward you in Jannat-ul-firdous." (Paradise) (GX 102, 102–E5 and Def. Clip 326C, Tr. 1618–19). Hussain asked Cromitie if he had ever thought of doing something for the sake of Allah; Cromitie responded, "Like what?" (GX 102–T, Tr. 1617). Hussain also asked Cromitie whether he had ever thought about traveling to Afghanistan. In contrast to his earlier (conveniently unrecorded) statement, Cromitie replied that he did not want to go to that war-torn country. (GX 102–E3).

Ten days later, during a meeting on October 29, 2011, Hussain again asked Cromitie what he would do, "If Allah ... asked for, for you to go, to go to the jihad...." Cromitie's response was equivocal; he said he would have to investigate the matter. (GX 103–E1).

That equivocal response was of a piece with Cromitie's behavior. Over the next two months, from late October through December 2008, Hussain and Cromitie met at least ten times. During those meetings, Cromitie said a great many things that

suggested a willingness to commit some violent act against Jews or the United States. It was during the October—December 2008 period that Cromitie made some of his most hate-filled remarks. His anti-Semitism was particularly on display; among the things he said during taped conversations were, "Look at the Jewish guy. You're not smiling no more, you fucker." I hate those bastards.... I hate those motherfuckers. Those fucking Jewish bastards.... I'd like to get one of those. I'd like to get a synagogue. Me Yeah, personally.... The one in New York City and Brooklyn. That one is like the mother of the synagogues. (GX 109–E4–T); You think the World Trade Center was something? That was nothing.... When you hit those spots like synagogues ... that bothers them. (GX 116–E2–T); I don't care if it's a whole synagogue of men (GX 116–E1–T).

But whenever Hussain asked Cromitie to act on those sentiments—make a plan, pick a target, find recruits, introduce the CI to like-minded brothers, procure guns, and conduct surveillance (GX 104–E2, 105A–E3, 106 (Defense Clips 331, 332, 333, 334, 335), 108–E–2, 109–E2, 109–E3, 110–E1, 112–E1, 112–E2, 1120E3, 113–E1, 113–E2)—Cromitie did none of the above. Hussain tried to coax Cromitie into participating in a jihadist event by suggesting that he would be rewarded in the afterlife. But the promise of Paradise proved insufficient to get Cromitie to take any affirmative steps toward planning a jihadist attack. On December 10, Hussain pointed this out to Cromitie (GX 112–E1, Tr. 1702–04); defendant responded, "Maybe it's not my missions then. Maybe my mission hasn't come yet." (GX 112–E3, Tr. 1705).

Toward the end of 2008, the Government began adding more worldly inducements to Hussain's offer or paradise. In December 2008, Hussain promise to give Cromitie his BMW—a car Cromitie greatly admired—but only after Cromitie had completed a mission. (Tr. 893–94, 988). Hussain first offered Cromitie cash incentives for doing jihad during this period as well. (Tr. 1708–09). Cromitie did not rise to the bait.

Hussain left the country on December 18, 2008, for an extended trip to Pakistan and London. (3502–45). Although he told Cromitie he would only be gone for a week (3502–45), he did not return to the country until more than two months later, on February 22, 2009. (3502–47).

While Hussain was out of the country, Agent Fuller held a meeting with officials from Stewart Airport, to brief them on their investigation into Cromitie. During that meeting, Fuller told a representative of the Transportation Safety Administration, the Deputy Federal Security Director, as well as a sergeant from the New York State Police that "Cromitie was unlikely to commit an act without the support of the FBI source...." (3501–188). That assessment was indubitably correct: when Hussain returned and contacted Cromitie, defendant admitted that he had done absolutely nothing to further the goal of a jihadist mission during the CI's absence: "I ain't do nothing ... since you been gone, I been, like okay I guess everything's down the drain now ... I just dropped everything." (GX 114–E1).

Fuller himself was becoming convinced that Cromitie was no more than a big talker. When someone (presumably a fellow agent, the name has been redacted) emailed Fuller with a question about Cromitie's claims about traveling to Afghanistan, Fuller admitted, that "There are several things he has discussed which seem to be unfounded." (3501–194). By February 2009 the FBI knew that Cromitie (1) had no family connection to Afghanistan, (2) never traveled to Afghanistan,

and (3) never bombed police stations or committed murder.

Nonetheless, after Hussain returned to the United States, he promised Cromitie money—on February 23, and again on February 24—as well as money for any "lookouts" he might be able to recruit. (GX 115, Defense Clips 357, 358, 395). Hussain told Cromitie, "My people . . . Jaish–e–Mohammed is willing to do anything to get some operation done here. . . ." (GX 114–E1). Hussain admitted that on several occasions he "suggested" to Cromitie that he would "get a lot of money" if he participated in a jihadist plot. (Tr. 892, 1869–70).

The court believes, and specifically finds that it was at about this time when Hussain offered Cromitie as much as a quarter million dollars to participate in a mission. No such offer was sanctioned by Agent Fuller or anyone from the F.B.I. (*See* Tr. 242; 3502–87) ("The source was previously instructed that he was authorized to offer each of the defendants $5,000 cash once they completed what they were doing for the operation."). The $250,000 offer cannot be independently corroborated, because it was not made during any recorded encounter between Cromitie and Hussain.[2] But there can be absolutely no question that such an offer was made. On April 5, 2009, in a conversation that was recorded, Hussain reminded Cromitie that he (Hussain) had offered Cromitie $250,000 on a prior occasion. (GX–239–T) ("I told you, I

can make you $250,000, but you don't want it brother. What can I tell you?").

Cromitie responded far more enthusiastically to Hussain's offer of money than he had to the promise of a reward in the afterlife. On February 23, he said, "Ah man, Maqsood, you got me," and slapped hands with the Government's agent. (GX 114–E2, Defense Clip 394, Tr. 1745–46). Cromitie's enthusiasm carried over to the next day during the surveillance of Stewart Airport: "Imagine if we hit all the planes in one spot. . . . [O]ne will blow up, the other one blow, and then they'll all blow. . . . And we don't even have to be nowhere in sight." (GX 115–E2–T).

### 3. The Long Silence and the Weeks Leading Up to May 9

Immediately after Cromitie accompanied Hussain on a "surveillance" drive around Stewart Air Force Base on February 24, there began a second hiatus in the Cromitie/Hussain relationship—a period of some six weeks when Cromitie assiduously avoided seeing or even talking to the CI.[3] The parties disagree about whether this was because Cromitie did not really want to be a terrorist (the defense) or because he was worried about getting caught and going to jail (the Government), but that is really of no moment.[4] It is undisputed that, for a month and a half—until the April 5 conversation in which Hussain referred to the prior offer of $250,000—Cromitie had no contact with the Hussain.[5]

---

2. As an offer of this magnitude was not officially sanctioned, Hussain had every incentive not to turn on the recording device—which he controlled—during any conversation when he made such an outlandish offer.

3. Actually, the CI called Cromitie the following day (February 25) with the hope of setting up a meeting, but Cromitie declined saying he was going away the following Saturday to Jamestown, North Carolina: "Don't worry my brother I'm going to see you. Just ease. All right, my brother?" (GX 224–T).

4. The FBI offered three possible reasons why Cromitie was avoiding the CI: (1) Cromitie was making money selling marijuana; (2) He had second thoughts after conducting surveillance of the airport on February 24; or (3) he was having trouble finding lookouts to aid in the operation. (3501–259).

5. As a result, we know that the $250,000 offer had to have been made on or prior to Cromitie's last conversation with Hussain before the hiatus, (February 24, 2009).

This, coupled with its discovery of all the holes in Cromitie's story, led the FBI to conclude the investigation had gone cold. (3501–259). Fuller tried to stoke the investigation back to life by having Hussain call Cromitie by telephone on numerous occasions; however, Cromitie refused to take any of Hussain's calls (Tr. 445).

Then, on April 5, 2009, Cromitie re-initiated contact with Hussain. In the intervening weeks, Cromitie had lost his job at Wal-mart and failed to get it back. He was broke and desperate for money—he had even sold a camera that Hussain bought so Cromitie could take "surveillance photos" on the Stewart trip. Hussain leveraged that unfortunate situation to coax Cromitie to go forward with a jihadist plot. Cromitie protested that he did not want to be a martyr, but nonetheless agreed to go forward. (GX 116–E3).

Once committed, Cromitie became an enthusiastic jihadist. While defendant did not want to blow himself up, he showed no compunction placing bombs in the synagogue: "I want to walk in the place. I actually want to walk in, oh it's a nice place, one bag here, one bag here, make like (UI) oh, man this is so beautiful. . . . Oh . . . boom, boom, boom. When I leave, I leave with two bags, one bag stays . . . and then I go outside, so that's all I want to do." *Id.* He immediately began to take concrete steps to accomplish this goal. Within a couple of weeks after his April 7 conversation with Hussain, Cromitie brought defendant David Williams to Shipp Street, and the three men went out on a drive to look at potential targets.

Cromitie also finally began recruiting participants to serve as lookouts. He first told Hussain about someone named "Daoud" (David Williams) on April 5, and after his release from a ten day stint on Rikers Island, Williams joined Cromitie and Hussain on April 23 to make plans for the attacks. Cromitie and David Williams introduced Onta Williams and Payen to the CI five days later, on April 28.[6] The Government produced a couple of "bombs" and a "Stinger missile," stored this "ordnance" in Connecticut and took defendants out of state to see it (as well as to confer federal jurisdiction over the crimes). Hussain and the four defendants laid the final plans for the operation that was to take place on May 9, 2009. On that evening, the defendants drove from Newburgh to Riverdale, while numerous cameras (on land and in the air) followed their every move. Once in the Bronx, Cromitie placed the "bombs," while the other three men acted as lookouts.[7] Once the bombs were set Cromitie and the three lookouts rejoined Hussain in the car, where they were immediately seized by hundreds of law enforcement agents. All this we saw the next day on the television news.

*Application of the Law to the Facts*

As it turns out, the Government did absolutely everything that the defense predicted in its previous motion to dismiss the indictment. The Government indisputably "manufactured" the crimes of which defendants stand convicted. The Government invented all of the details of the scheme—many of them, such as the trip to Connecticut and the inclusion of Stewart AFB as a target, for specific legal purposes of which

---

**6.** The separate decision on defendants' post-trial motions contains an extensive discussion of the evidence pertinent to this time period, as viewed most favorably to the Government. The issues raised by the defendants' Rule 29 motions are not relevant to this motion, so that discussion need not be repeated here.

**7.** Cromitie proved to be a totally inept bomber. On the ride down he was unable to arm the IEDs; he then placed the first of the three devices without turning the timer on.

the defendants could not possibly have been aware (the former gave rise to federal jurisdiction and the latter mandated a twenty-five year minimum sentence). The Government selected the targets. The Government designed and built the phony ordnance that the defendants planted (or planned to plant) at Government-selected targets. The Government provided every item used in the plot: cameras, cell phones, cars, maps and even a gun. The Government did all the driving (as none of the defendants had a car or a driver's license). The Government funded the entire project. And the Government, through its agent, offered the defendants large sums of money, contingent on their participation in the heinous scheme.

Additionally, before deciding that the defendants (particularly Cromitie, who was in their sights for nine months) presented any real danger, the Government appears to have done minimal due diligence, relying instead on reports from its Confidential Informant, who passed on information about Cromitie—information that could easily have been verified (or not verified, since much of it was untrue), but that no one thought it necessary to check before offering a jihadist opportunity to a man who had no contact with any extremist groups and no history of anything other than drug crimes.[8]

Finally, in structuring the crime, the Government saw fit to create roles for persons other than Cromitie—who at least had uttered malicious and threatening statements about Jews and the United States—and to offer those roles to individuals who had no history of terrorist leanings.

The question is whether it adds up to constitutionally outrageous misconduct by the Government. We consider this question separately for Cromitie and the other three defendants.

### 1. *James Cromitie*

Until the last few weeks of the sting operation, its sole target was James Cromitie. None of the other three defendants were in the picture until April 10—a month before the May 9 "operation" that resulted in the defendants' arrest. Virtually all of the evidence about the Government's activity relates to Hussain's dealings with Cromitie. All of the pressure that Hussain brought to bear to put together a "mission" was concentrated on Cromitie. All of the inducements that were offered (whether authorized or not) were offered to or through Cromitie.

█ Nonetheless, as to Cromitie, it is relatively easy to conclude that the Government committed no outrageous misconduct.

First, the actions challenged by Cromitie's motion were all actions aimed at inducing Cromitie to commit the charged crimes. Whether viewed alone or bundled together, none of those actions is in and of itself constitutionally outrageous or conscience shocking, as that term has come to be understood. Therefore, after *Chin,* Cromitie's claim that the Government's conduct was outrageous fails as a matter of law.

---

**8.** The court is particularly troubled by this because this incorrect information factored into wiretap applications made to judges of this court sitting in Part I. This was the subject of an earlier motion to suppress pursuant to *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978)—a motion the court sees no reason to revisit, because probable cause would still have existed if this information had been excised from the warrant application. *See Franks,* 438 U.S. at 171–72, 98 S.Ct. 2674 (If, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required.)

Seeking a way to circumvent *Chin,* Cromitie argues that the Government's conduct is outrageous because it originated the very idea of the criminal activity of which he stands convicted—it "invented the crime."

It is, frankly, arguable whether committing jihad was the Government's idea or Cromitie's. The evidence admits of either conclusion, and the jury did not need to resolve that issue in order to reach its verdict on the issue of entrapment.

But there is no denying that Cromitie expressed interest, even enthusiasm, for the idea of jihad from the early days of his dealings with Hussain—a fact that quite properly set off alarm bells in the minds of law enforcement agents. Cromitie's vitriolic statements about Jews and the United States, uttered repeatedly and in the most offensive terms, are on tape for all to hear, as is his persistent claim (true or not) that he wanted to direct or participate in some violent action against those targets. Whatever Hussain's credibility issues (and they are legion), this court can well believe that Cromitie made deeply and frighteningly offensive and threatening remarks to the CI in their earliest meetings—even if no confirmatory recordings of those meetings exist.

Furthermore, it is the FBI's mindset that we are looking at in connection with a motion addressed to government misconduct. The FBI indisputably received alarming reports about Cromitie from Hussain over the summer of 2008—including, *inter alia,* reports that Cromitie "had no problem with Jihad" and would be interested in joining JeM. (3501–5); that Cromitie wished to travel "back" to Afghanistan because of all the "brothers killed in Pakistan and Afghanistan;" and that he was prepared to "die like a shahid (martyr)" and "go to paradise." The FBI was told that Cromitie said, "I want to do something to America" (3502). The FBI

was fully justified in opening an investigation on the basis of those reports—no misconduct there. Indeed, after hearing what Hussain had to say about Cromitie, the FBI would have been derelict in its duty not to undertake some sort of investigation.

Once the investigation commenced, Cromitie's oft-expressed views, as captured on audio and video tape during the succeeding months, confirmed, rather than undermined, Hussain's accounts of their unrecorded conversations. Cromitie himself gave the FBI no reason to doubt its informant, and every reason to continue its investigation—even to the point of trying to set up a sting operation.

The various tactics the Government employed *vis a vis* Cromitie have all been challenged as constituting outrageous governmental misconduct in prior cases—*see e.g. United States v. Myers,* 692 F.2d 823 (2d Cir.1982) (ABSCAM) (Government agent coaching congressman step-by-step how to accept a bribe); *United States v. Nicely,* 922 F.2d 850, 850 (D.C.Cir.1991) (the offer of substantial sums of money); *United States v. Lakhani,* 480 F.3d 171, 182–83 (3d Cir.2007) (Government played the role of buyer and seller in a supposedly illegal arms transaction); *United States v. Rahman,* 189 F.3d 88, 131 (2d Cir.1999) (Government's lending direction, technical expertise, and critical resources to a conspiracy to bomb targets in New York City); *Schmidt,* 105 F.3d at 84–85 (agent posing as an assassin). In every instance save one—*United States v. Twigg,* 588 F.2d 373 (3d Cir.1978), about which more will be said below—the courts have denied these challenges, concluding that the Government's activity did not cross the line between appropriate and inappropriate law enforcement behavior. *See also, United States v. Cuervelo,* 949 F.2d 559, 568 (2d Cir.1991); *United States v. LaPorta,* 46

F.3d 152, 160 (2d Cir.1994); *United States v. Santana,* 6 F.3d 1, 4 (1st Cir.1993). This court is not familiar with a case in which so many different tactics were used on a single individual, but in the end, Cromitie justified the Government's persistence when he proved to be ready and willing to commit terrorist acts. Hussain may have spent a half a year or more trying to persuade Cromitie to go forward with a jihadist mission, but there was no coercion of any sort, no suggestion of duress and no physical deprivation. After *Chin,* I harbor considerable doubt whether anything less would ever qualify as "outrageous" misconduct in this Circuit.

Cromitie argues that he was psychologically coerced into participating in the crime, because Hussain used his greater knowledge of Islam to engage in what the moving brief describes as "shameless exploitation of Cromitie's religious inclinations as a vehicle for persuading him to become a member of Hussain's terrorist sting operation so that he could be charged with a crime." (Cromitie Mot. at 19). However, this court sees no evidence of psychological coercion that would rise to the level of outrageous misconduct by the Government. No view of the evidence, even the one most favorable to the defense, supports a finding of undue pressure or duress. Even if one discounts everything that Hussain said about his three unrecorded encounters with Cromitie at the outset of their relationship—indeed, even if one assumes (contrary to what Cromitie himself said during a taped conversation) that the idea of doing jihad originated with Hussain and not defendant—indisputable evidence, captured on video and audiotape, reveals that, for many months before anyone committed a crime, Cromitie (1) exhibited a warped view of Islam that justified his hatred of the United States and of Jews; (2) bragged about his (non-existent) background as a violent individual; and (3) expressed an interest in

doing something violent to those he hated. There is not the slightest evidence that Hussain somehow coerced Cromitie into forming the views that he espoused in their conversations.

Moreover, the fact that religion was the common bond that the CI exploited to form his relationship with Cromitie does not make the Government's ruse any more reprehensible than others employed by Government agents in the past—ruses that have played on vulnerable aspects of a defendant's character, such as poverty, drug addiction or sexual attraction. *See, e.g., United States v. Chin,* 934 F.2d at 399 ("The type of psychological manipulation here—in particular, the [postal inspector's] efforts to win Chin's friendship and trust through the creation of a phony pen pal relationship [centered around mutual interest in child pornography] poses far less serious concerns" than "extreme physical coercion"); *United States v. Mahon,* 2010 WL 4038763, at *8–*10 (no outrageous conduct where "the government deliberately chose to present defendants with a younger, sexually attractive female to win their confidence," and she "knew that her attractiveness was a part of the plan to secure admissions, sought to appear friendly and attractive to defendants, wore arguably immodest clothing around defendants, mailed defendants sexually suggestive photographs, and engaged in sexual banter with defendants"); *United States v. Nolan–Cooper,* 155 F.3d 221, 234–35 (3d Cir.1998) (romantic relationship between undercover agent and defendant, including "dinners, nightclubbing, [and] partying," which was "directed at establishing and maintaining a close relationship between agent and suspect," was not "egregious enough to make out a due process violation"); *United States v. Nicely,* 922 F.2d 850, 859 (D.C.Cir.1991) ("dangling enormous sums of money to a poor businessman, and then later making veiled threats

of physical harm when the [illegal] transfer was delayed" not egregious); *United States v. Emmert*, 829 F.2d 805, 810 (9th Cir.1987) (no outrageous conduct where government approached and offered $200,000 to a college student to secure a supply of cocaine for a government agent and threatened him in the course of the investigation as a bargaining tactic); *United Stated v. Harris*, 997 F.2d 812, 816–18 (10th Cir.1993) (refusing to hold that government distribution of narcotics to known addict is always coercive, but speculating that government entering rehabilitation center and selling heroin to a recovering addict may offend due process). The evidence simply does not support any view of Cromitie's having been manipulated by someone who took advantage of his religious devotion. On the contrary, it appears that religious conviction was not enough to persuade Cromitie to act; money—and lots of it—was the root of Cromitie's evil.

Finally, there is the single most damning fact about Cromitie: when the Government had all but lost interest in the man, he came back to Hussain. Out of work, broke and unable to think of another way to cash in, Cromitie re-initiated contact with a person whom he believed to be a terrorist. Cromitie knew perfectly well why Hussain was interested in him: the two men had been discussing a "mission" (and getting paid for doing a mission) for months. Cromitie even believed that Hussain had gone back to Pakistan to obtain funding for that "mission" from J–e–M. Cromitie is not a particularly intelligent man, but it defies reason to think that he was unaware that he was getting himself back into the jihad game when he called Hussain out of the blue. His protests about his lack of interest in martyrdom notwithstanding, Cromitie—voluntarily

and without any prompting—put himself back into the Government's sights; and he expressed nothing but enthusiasm for the mission from the time that he (not the Government) resurrected the sting by reaching out to Hussain. Aside from issues of sentencing entrapment (which are beyond the purview of this opinion), it is hard to think of why the Government's calling Cromitie's bluff should qualify as outrageous misconduct.

Cromitie argues that the Government's manufacture of federal jurisdiction, without more, is sufficient to warrant a finding of outrageous misconduct. This argument is based on *United States v. Archer*, 486 F.2d 670, 681 (2d Cir.1973), in which the Second Court reversed a conviction under the Travel Act on the ground that the Government had improperly "manufactured" federal jurisdiction over a crime that was really "local" in nature. However, outrageous Government misconduct is a due process issue, and *Archer* was not even a due process case. *See LaPorta*, 46 F.3d at 160. It is also easily distinguished from the present case since it involved both a situation in which government informants lied not only to the targets of the investigation, but also to "local law enforcement officials, prosecutors, grand juries, and judges," *United States v. Wallace*, 85 F.3d 1063, 1065 (2d Cir.1996).[9] *Archer* also raised significant federalism concerns that are completely absent here. *See Archer*, 486 F.2d at 677–78. Finally, the decision has never been followed, has frequently been criticized, *see, e.g., United States v. Podolsky*, 798 F.2d 177, 180–81 (7th Cir.1986) (citing cases), and has "limited precedential force" even in this Circuit, *United States v. Wallace*, 85 F.3d at 1067.

Finally, Cromitie tries to bring himself within the ambit of the one case known to

---

**9.** This court might well have found a violation of due process in *Archer* on the basis of these extraordinary facts—which are, needless to say, completely absent here.

this court in which a Circuit Court of Appeals (the Third Circuit) dismissed an indictment on due process grounds because of what it viewed as the excessive level of government involvement in criminal activity: *United States v. Twigg,* 588 F.2d 373 (3d Cir.1978). In *Twigg,* federal agents, acting through an informant (Kubica, who is analogous to Hussain) both conceived a drug crime (the manufacture of methamphetamine) and then, over a period of months, supplied the defendants (one of whom, Neville, is closely analogous to Cromitie here, and one of whom, Twigg, is more closely analogous to the other three defendants) with the location, equipment and raw materials needed to create a "speed" lab. *Twigg,* 588 F.2d at 375–76. The court had no difficulty concluding that Neville was not entrapped, but overturned his conviction nonetheless, holding that the police involvement was "so overreaching as to bar prosecution of the defendants as a matter of due process of law." *Id.* at 377. The court stated: "We do not believe the Government may involve itself so directly and continuously over such a long period of time in the creation and maintenance of criminal operations, and yet prosecute its collaborators." *Id.* at 379.

The Government distinguishes *Twigg* "principally, because the cooperating witness in *Twigg* [Kubica] reached out to one of the defendants [Neville] and 'suggested the establishment of a speed laboratory.'" (G. Br. at 47), *quoting Twigg,* 588 F.2d at 380. Frankly, I do not find that a particularly persuasive point of distinction. True, Cromitie himself indicated that he wanted to "do something" to America—and later took pains to emphasize that "doing something to America" was *his* idea, not the

CI's—and the opinion in *Twigg* does not identify any similar statement with respect to Neville. However, there is really no meaningful distinction between what the CI did in *Twigg* and what Hussain did here. Hussain translated Cromitie's vague "do something to America" comments, and his rants against Jews, into concrete ideas that most definitely did not originate with defendant: putting together a team (create a conspiracy) to plant IEDs at synagogues in Riverdale (commit terrorist activity), and to shoot Stinger missiles at Air Force aircraft in Orange County (an offense carrying a statutory 25 year mandatory minimum). Then Hussain (not Cromitie) made it possible for those things to happen—or at least seem to happen.[10]

However, *Twigg* is *sui generis:* it has never been followed, even in the Third Circuit, and conduct equally reprehensible has been repeatedly found not to violate a defendant's Fourteenth Amendment rights in other courts. The trajectory of the law is away from *Twigg,* not toward it. I thus have no reason to believe that our Court of Appeals would be persuaded by that lone precedent to do something that it has never done: conclude that the Government crossed the line between fair law enforcement and violation of a citizen's constitutional rights.

That said, I acknowledge that there is something decidedly troubling about the Government's behavior *vis a vis* Cromitie, for three reasons.

First, this is not a situation in which a Government agent, working undercover, pretended to be engaged in criminal activity "to detect criminal conspiracies." *Rahman, supra,* 189 F.3d at 131. Hussain did

---

10. Neither this case nor *Twigg* is like *Schmidt* (a case on which the Government relies heavily). In *Schmidt,* the specific idea of the crime (murdering an FBI agent) plainly originated with the defendant. It is, rather, a case in which a defendant's vague and non-specific statements about doing "something" reprehensible were transmogrified into a coherent conspiracy to commit serious federal offenses carrying potential life sentences.

not infiltrate some pre-existing criminal enterprise; there was no criminal activity for him to detect until he helped Cromitie put such activity together. Indeed, after reviewing the record yet again, I am left with the firm conviction that if the Government had simply kept an eye on Cromitie, and moved on to other investigations, nothing like the events of May 9, 2009 would ever have occurred. The Government protests that Cromitie might have succumbed to the blandishments of some real terrorist at some unspecified time in the future, but I am constrained to agree with the FBI's assessment, delivered to the officials at Stewart Air Force Base, that "Cromitie was unlikely to commit an act without the support of the FBI source...." (3501–188).

Nor was this an instance where the Government's agent had only "limited participation" in the criminal activity. *United States v. Russell*, 411 U.S. at 432, 93 S.Ct. 1637. Hussain was the prime mover and instigator of all the criminal activity that occurred, right up until the last moments of the conspiracy, when he had to stop the car he was driving and "arm" the "explosive device" because the utterly inept Cromitie could not figure out how to do it.

Finally, it took quite a while for Cromitie to take the bait that was offered to him; it was fully nine months between the time Hussain met the defendant and the early April 2009 date when Cromitie finally became a committed and enthusiastic participant in the "mission." The fact that Cromitie resisted for such a long time lends some credence to the defense argument that the Government's measures fall on the illegal side of whatever line *Chin* draws between simply being induced to commit a crime, on the one hand, and effectively being manipulated or coerced into doing so, on the other.

In the end, however, Cromitie's own behavior fatally undermines any suggestion that he was subjected to pressure so coercive as to run afoul of the Constitution. He had successfully resisted going too far for eight months, and the Government was about to turn away from him and fry other fish. Then Cromitie affirmatively re-injected himself into what he knew to be a criminal situation. He came back to a person he believed to be a Pakistani terrorist and, for money and the cause (primarily, in this court's opinion, for money), he participated willingly and enthusiastically in a plot to commit unimaginably heinous crimes rooted in bigotry and hatred—crimes that would have resulted in the loss of innocent life and the unwarranted destruction of property had they been real. Cromitie participated in that activity of his own free will, and he equally willingly procured the participation of others.

There were undoubtedly other ways to conduct an investigation into James Cromitie. This court has long been concerned that the Government failed to make a few fairly elementary inquiries at the outset— inquiries that would have revealed Cromitie to be a liar and a blowhard long before the Government began to suspect as much. Furthermore, it is troubling, for many months, the Government dangled what had to be almost irresistible temptation in front of an impoverished man from what I have come (after literally dozens of cases) to view as the saddest and most dysfunctional community in the Southern District of New York. From the perspective of the citizens of Newburgh, who are frequently targeted by various Government operations, I can well understand why the FBI's conduct is seen as both outrageous and incomprehensible—just as I can see why the same conduct seems perfectly appropriate and acceptable when viewed through the lens of Riverdale's Jewish community, or of military families.

In the end, however, it is not the province of the courts to tell the executive how to investigate potentially criminal situations. Neither is this court the place to address the serious questions that this case raises about how the Government is deploying the public fisc in an age of both terror and budgetary constraints. This court is concerned only with the constitutionality of the Government's conduct. Sting operations, even elaborate ones that appear designed to be shown on the evening news, are legal; and Cromitie certainly gave the Government ample reason to think that he might be susceptible to being stung.

For the foregoing reasons, Cromitie's motion to dismiss this action on the ground of outrageous governmental misconduct is denied.

### 2. *David Williams, Onta Williams and Laguerre Payen*

Obviously, to the extent that the two Williamses and Payen rely on the arguments rejected above, the prior discussion applies to them as well. And to the extent that their allegations of outrageousness rest on the outrageousness of the Government's behavior *vis a vis* Cromitie—the person who was ultimately responsible for involving them in the plot—their motion necessarily fails, because the Government's conduct was not outrageous *vis a vis* Cromitie.

But these three defendants make another argument: they contend that the Government committed misconduct because it had no need to involve them or anyone else in its "sting" operation. Acknowledging that the Government had reason to investigate whether Cromitie might act on his rhetoric, the Williamses and Payen point out that no evidence suggests that any of

them had expressed hatred of or vitriol against Jews or the United States, or had discussed wanting to perform a jihadist act, before they showed up at the Shipp Street house. They were simply poor men who needed money—and who, in the case of Onta Williams and Payen, agreed to nothing more than to act as "lookouts."

■ Unfortunately, this argument is actually weaker than Cromitie's. If *Chin* establishes anything, it is that the Government can offer people even people chosen seemingly at random—the opportunity to join in criminal activity without running afoul of the Constitution; it can even offer them inducements to do so, as long as it does not resort of coercive or forceful measures. Not a scintilla of evidence suggests that either of the Williamses or Payen were coerced, pressured or manipulated, by Hussain, Cromitie, or anyone else, to participate in the "mission," let alone that the Government employed tactics that were in and of themselves conscience-shocking in order to persuade them to participate in the scheme. They were offered money to participate in criminal activity, and they said yes. It is of no moment that they were poor and needed money; it is of no moment that the criminal activity was terrorism rather than drug dealing or money laundering or securities fraud.

It is absolutely true that the Government did not need to involve anyone else in order to "sting" Cromitie, the lone object of its long-term investigation.[11] And I repeat: trolling among the citizens of a troubled community, offering very poor people money if they will play some role, any role, in criminal activity, looks very different to the people of that community than it does to the law enforcement community. But

---

11. Doubtless arguments about this aspect of the case will be raised at the sentencing, where they are properly considered.

nothing in any of the limited jurisprudence on outrageous government misconduct suggests that this sort of activity, troubling though it might be, violates anyone's constitutional rights.

The outrageous government misconduct motion by David Williams, Onta Williams and Laguerre Payen is denied.

This constitutes the decision and order of the court.